## MAXWELL LAND GRANT COMPANY *v.* DAWSON.

ERROR TO THE SUPREME COURT OF THE TERRITORY OF NEW MEXICO.

No. 1065.  Submitted January 5, 1894. — Decided February 5, 1894.

It is unnecessary to decide whether under the civil law, as in force in New Mexico in 1868, a written instrument was not necessary for the transfer of real estate, (about which *quære,*) as, if such a provision had previously existed, it had been supplanted at that time by territorial enactments.

Under the most liberal construction of the civil law, a transfer of title to real estate could not be effected without identification of the land, delimitation of the boundaries, and delivery of possession, all of which were wanting in this case.

Certain loose parol statements and certain hearsay evidence are held to be inadmissible in this action of ejectment, either to fix the boundaries of the defendant's deed, or to show the character and extent of his alleged adverse possession.

When the defendant in an action of ejectment sets up title under adverse possession, it is competent for him to show that it was generally known in the neighborhood that he was in possession of the disputed premises, and was generally regarded as their owner.

When the description in the deed through which a plaintiff in ejectment

claims covers a large estate, as a whole, excepting from the grant such tracts, "parts of said estate," warranted not to exceed a stated number of acres, ",which the parties of the first part have heretofore sold and conveyed," the burden of proof is on the plaintiff to show that the land in suit does not come within the exception.

The New Mexico statute of limitations as to real actions, Comp. Laws New Mexico, 1884, § 1881, operates when the period of limitation has expired, if set up and maintained by the defendant in an action of ejectment, to extinguish the right of the plaintiff, and to vest a complete title in the defendant.

THIS was an action of ejectment brought by the plaintiff in error in the District Court of the Fourth Judicial District of New Mexico, to recover of the defendant the possession of a large tract of land within what is known as the Beaubien and Miranda, or Maxwell land grant.

The declaration was in the ordinary form of a declaration in ejectment, averring the right of the plaintiff to the possession of the entire Maxwell grant, and the unlawful entry of the defendant into that portion thereof situate in the county of Colfax.

Defendant disclaimed as to all the land described in the declaration, except a certain tract described in his first additional plea, as follows : " All the land in the valley or drainage of the Vermejo River, in the county of Colfax, Territory of New Mexico, within the following boundaries: Commencing at the dam on said river, at the upper end of John B. Dawson's farm ; thence running to a high point of rocks on the north side of the Vermejo Cañon ; thence following along the top of the divide west of Rail Cañon to the head of Saltpeter Cañon ; thence down along the top of the divide east of Saltpeter Cañon, to a point on a line with John B. Dawson's rock fence ; thence following the line of said rock fence across the Vermejo to the top of the divide between the Vermejo and Van Bremmer Cañon ; thence following the top of said divide to the head of Coal Cañon, and thence along the top of the divide east of Coal Cañon to a point on said divide nearest the place of beginning ; thence to the place of beginning." He further pleaded adverse possession of these lands for more than ten years next before the commencement of the suit, and

that the plaintiff's right to sue for the same accrued more than ten years prior thereto.

Plaintiff deraigned title from the original grantees through Lucien B. Maxwell; but in the deed from Maxwell and wife to the Maxwell Land Grant and Railway Company of April 30, 1870, there was the following exception: " Excepting from the operation of this conveyance such tracts of land, part of the said estate hereby warranted not to exceed in the aggregate fifteen thousand acres, which the parties of the first part have heretofore sold and conveyed by deeds duly recorded on or prior to the 25th day of January, one thousand eight hundred and seventy.". All the subsequent deeds under which the plaintiff claimed, contained the same exception, though not exactly in the same words.

Upon the conclusion of the plaintiff's case, defendant offered evidence tending to show that he occupied under claim of title,and was generally reputed to own a large tract of land, described in his plea, the lower line of which was the projection, for a distance of about six miles east and west, of a stone fence built by him across the valley of the Vermejo River, and including within its east and west limits the entire of what· was known as the Coal and Rail Cañons and the upper waters of the Lacey, Spring, and Saltpeter Cañons, with the lands and drainage incident thereto. The testimony upon the question of adverse possession, of which there was a large amount, showed that defendant made use of the cañons for the purpose of ranging or pasturing cattle, horses, and hogs, and indicated that from the year 1872 to 1883 he had an average of 125 horses, 200 cattle, and some hogs, which were turned loose in the cañons within the tract. He looked-after them from time to time, and if cattle belonging to other people were there, he turned them out. There was also evidence tending to show that below him the valley of the Vermejo River was pastured by one Lacey, and below *him* by one J. W. Curtis, and also by Miller and Maulding. The testimony of Maulding himself tended to show that he and Dawson and two others went into possession of the land under a contract of purchase from Maxwell, and that they were virtually tenants in common under this contract;

that after Maxwell put them into possession they divided up the entire tract, which he undertook to sell them, each one taking exclusive possession of his particular part. There seems to have been what the witness termed "a kind of a bond for a deed," to which Maxwell and Curtis were parties, but it was not produced, and testimony of its contents was ruled out.

Defendant himself took the stand and testified that in 1867 Curtis, Maulding, and Miller came on to the Vermejo, and told him "they had a contract," and claimed to have possession of the land from the dam which marked the starting point of his (Dawson's) deed, down the river, to a place known as the O'Donnell farm, with all that drainage and lands the water would flow in, between these points and the Vermejo River; that it included the land claimed by him, the defendant; that they were residing upon a part of the land themselves, and that Maulding and Curtis told him to take possession of the land he claimed, and on the line fixed by them as his lower boundary he built a stone fence across the valley. He also testified that in June, 1868, he had a conversation with Lucien B. Maxwell in regard to the tract of land which he claimed; that Maxwell knew he was in possession of it; that the boundaries of the tract set forth in his plea were pointed out by Maxwell, and that he paid $3700 for the land, though he afterwards stated that he paid the money to Mr. Curtis, who gave it to Maxwell. On cross-examination, he produced a deed from Maxwell and wife to himself, bearing date January 7, 1869, in which, for a consideration of $3700, Maxwell conveyed to him the property admitted in this suit to belong to him, and described as follows: " All the land or ground now suitable for farming or cultivating purposes in the valley or drainage of the Vermejo River, county of Mora, Territory of New Mexico, within the following boundaries, to wit: Beginning at a certain dam at the head of a certain ditch at the right-hand point of rocks, from thence running down on the north side of said river to a certain other pile of rocks, on a knoll or elevation, with some bushes near thereto; thence running very near southward across said river to a piñon tree

to the right of a ridge, near a wash, which tree is marked
with a letter 'L;' thence running up said river on the south
side to the place of beginning; containing about —— acres,
more or less." This deed he claimed to have received by mail
some time in 1869, and admitted to have shown to one Morley,
who, in 1871, came to his house, under orders from the presi-
dent of the plaintiff company, to survey the land.   He appears
to have entered upon the land the year before the deed was
given, to have made numerous improvements, such as houses,
orchards, and fences, and to have put the land under cultiva-
tion by means of irrigating ditches.   All these improvements,
except some cattle fences, were put upon the land described in
the deed.   Upon redirect examination, he stated that when he
first came on the Vermejo, in the early part of 1868 or 1869,
passing through, Curtis and Maulding told him that they had
a contract with Maxwell for a piece of land there, beginning
at the dam, and running down the river to the lower end of
what was known as the O'Donnell farm, with all the drainage,
with the water that flowed from between this dam and the
lower end of the O'Donnell farm; that they asked him, de-
fendant, if he wanted some of it.   "I studied a good while
and said, 'If you will let me have the upper part,' which they
agreed to do. . . . The contract which they had was for
a block of land. . . . Curtis and Maulding told me that
they had this whole drainage belonging to this block of land,
and this was my part; and I talked with them often about it,
and I talked with others."   He further testified that when
Maxwell pointed out to him the boundaries of the land, they
were down at a stage station some four miles away, though
they could see the prominent points of the tract from where
they were, and that this was six months before he received
his deed.

The case was tried by a jury, and a general verdict of not
guilty returned, upon which final judgment was entered.  The
case was then carried to the Supreme Court of the Terri-
tory, by which the judgment of the District Court was
affirmed. Plaintiff thereupon sued out a writ of error from
this court.

The third assignment of error, on which the case turns in this court, will be found in the margin.[1]

---

[1] III. In admitting the testimony of J. B. Dawson as to oral statements of Maulding and Curtis touching their contract for purchase of a tract of land as follows, to wit:

" They told me that they had a contract for a piece of land there, beginning at this dam that has been described, running down to the river to the lower end of what is known as the O'Donnell farm, with all the drainage of the water that flowed from between this dam and the lower end of the O'Donnell farm. They asked me if I wanted some of it. I studied a good while and said, 'If you will let me have the upper part,' which they agreed to."

. . . " Curtis and Maulding told me that this whole drainage belonged to this block of land, and this was my part; and I talked with them often about it, and I talked with others. I talked with Maxwell, and Maxwell and myself were frontiersmen at this time when I talked with them at the stage station, and he observed that I did not get as much land."

Also in admitting the testimony of other parties touching Dawson's ownership of and claim to the land in question, to wit: " Q. Have you ever heard the people other than Dawson residing in that vicinity speak of this land as belonging to any one ? A. Yes, sir. Q. State the names of the persons that they always spoke of it as belonging to. A. They have always spoken of it as belonging to Mr. John Dawson. Q. How long have you heard the people in that vicinity speak of it in that way ? A. Since I have been in the country."

. . . " Q. While you were in the Vermejo for that year or two, did you have any conversation with the people residing in that neighborhood as to who owned this tract of land that I read you the description of ? A. Yes, sir. Q. Was that tract of land spoken of as belonging to any one ? A. Yes, sir. Q. As belonging to whom ? A. Mr. Dawson's, and also of Miller, Maulding, and Curtis. Q. Have you heard them speak of Miller and Maulding's land, too ? A. Yes, sir. Q. Where were they with reference to this tract of land I read you the description of ? A. They were further down the creek. Q. Did you ever hear the people there speak of Dawson's south boundary line, as to where it was ? A. Yes, sir. Q. What was it, according to their statements ? A. They said it was above Lacey's ranch, adjoining Dawson's land. At that time it belonged to De Graftenreid. Q. During the time you were there, did you hear the people residing in that vicinity talk about Dawson's south boundary line ? A. Yes, sir. Q. What did they speak of as his south boundary line ? A. They said he was going to fence in his portion of the land from this stone fence, when it was found he was going to continue the stone fence to the high point to the divide."

. . . " A. He claimed from the dam on the Vermejo above his house to a rock fence below his house, and all drainages from either side."

*Mr. T. B. Catron* and *Mr. Frank Springer* for plaintiff in error.

Also the following: "Q. Was that land ever spoken of as the land of any one? A. Yes, sir. Q. Of whom? A. John B. Dawson." . . .

. . . . "Q. Have you ever heard the people in that neighborhood other than Dawson speak of any one as being the owner of this tract of land? A. Yes, sir. Q. Of whom did they speak as the owner of the land? A. As Mr. Dawson's."

. . . "Q. Did you hear any neighbors around there speak of this tract of land as the property of any one? A. Yes, sir; I have heard a great many speak of it. Q. They spoke of it as whose property? A. John B. Dawson's."

. . . "Q. Did you ever hear any of these people speak of this land as belonging to any one? A. Yes, sir. Q. They have spoken of it as belonging to whom? A. To Mr. Dawson."

. . . . "A. I told them that my father claimed all the drainage of the Vermejo River that was above his lower line, and the heads of the cañons — all the drainage above his lower line that come in on the property of the Horseshoe property, including his own place."

. . . "A. It was the upper tract of this purchase or the upper part of this purchase that Maxwell made to us on the Vermejo River."

. . . "A. I talked with my neighbors and we spoke of his upper tract. We often talked about this piece of land and Dawson owning this piece of land with its drainage."

. . . "Q. While this defendant was in possession of this land in 1868, did Maxwell have actual knowledge of that possession? A. Yes, sir."

. . . "Q. Did you have any conversation with any one in that neighborhood as to who claimed to own this tract of land? A. Yes, sir; I have heard several say who owned it. Q. Who did they speak of as owning it? A. They said Mr. Dawson was the owner of it."

Also the following: "Q. Do you know whether Maxwell knew that Dawson was in possession of this tract of land? A. He knew that he was."

. . . "Q. What land did these people claim to have possession of at that time? A. They claimed to have possession of the land from the dam that now belongs to me down the river to a place known as the O'Donnell farm, to the lower end of the O'Donnell farm, with all the drainage and lands the water would flow in between these points to the Vermejo River."

. . . "Q. Did Maxwell know that you were in possession of that tract of land? A. Yes, sir."

. . . "Q. What was to be the extent of that southern line? A. There was an extension from the east end, across Lacey Cañon, across Saltpeter Cañon to the top of the divide of Saltpeter Cañon and the waters flowing to the east; and the other end, an extension from the rock fence across Lacey Cañon to the top of the divide between Lacey Cañon and the Van Bremmer

· *Mr. Andrieus A. Jones* for defendant in error, to the third assignment of error.

It is apparent from a reading of the deed that the description is vague and uncertain, unless evidence *aliunde* is permitted to supplement the language used. If this deed had been permitted to remain in evidence without any explanation, it would undoubtedly have prejudiced the defendant's case before the jury. It was therefore essential for the defendant to explain why he did not claim the Van Bremmer Cañon and why he claimed that the deed covered the land in controversy. He could only do this by giving his conversations with Curtis and Maulding in regard to their contract with Maxwell. Whether the contract ever existed, or actually included the land in controversy, was immaterial. If Dawson was informed that it did, believed that it did, and acted upon this belief, proof of anything else was unnecessary. When counsel for plaintiff introduced the deed in evidence, he certainly knew that an explanation of its contents on redirect examination would be necessary, and his act in introducing the deed necessitated the introduction of the very evidence to which objection is now made.

The testimony in regard to the conversations with Maxwell was introduced for the purpose of showing that the then owner of the Maxwell land grant had actual knowledge of Dawson's claim and possession, and that at the time Lucien B. Maxwell conveyed the Maxwell land grant to the Maxwell Land Grant and Railway Company, the land in controversy in this suit was in the adverse possession of the defendant. It is true that this conversation occurred about four miles from the land about which they were talking, but the testimony shows that the prominent points and ridges on Dawson's place could be seen from that place. Dawson's tract of land is in the foot hills, and the country to the south where the stage station was, is an open prairie, and the prominent points on

Cañon. Q. Do you know why that line was established there at all? A. Yes, sir. Q. Why? A. To divide my property from the next property below."

the earth's surface, of which there are many, could be plainly seen not only at the stage station, but for a number of miles further south and east of that place.  During this conversation, Maxwell and Dawson certainly had in mind the identical tract now claimed by Dawson, and it was unnecessary that they should have been upon the land talked about in order to establish the boundaries of their respective possessions, but as a matter of fact they were on the larger tract contracted to Curtis, Maulding, and Miller, a part of which was then in the possession of Dawson.

Mr. Justice Brown, after stating the case, delivered the opinion of the court.

The controversy in this case relates to a tract of land within what is known as the Maxwell land grant, to a portion of which, about 1000 acres, described in the deed from Maxwell and wife to Dawson, it is admitted the defendant has a good title.  Defendant, however, claims title to about 20,000 acres lying outside of the boundaries of the tract admitted to belong to him, which is the property in dispute.  The case is before us upon certain errors assigned to the admission of testimony, and to the charge of the court.

(1) The third assignment of error is taken to the admission of the testimony of Dawson as to the parol statements of Maulding and Curtis touching their contract for the purchase of the land, which included that in controversy.  The court below held that there was no error in the admission of this testimony, because, under the civil law, land could be conveyed by parol, accompanied by delivery of possession; and that it was immaterial whether the statements of Maulding and Curtis were properly admitted or not, because Dawson had testified that he had conversations with Maxwell, the party from whom they claimed to have purchased, and that Maxwell pointed out the boundaries of the land he would receive under his agreement with Maulding, Miller, and Curtis, who were then in possession, and so recognized by Maxwell under his sale to them.

. We think the court erred in this particular. In the first place, we are not prepared to coincide fully in its opinion that, under the civil law as in force in New Mexico in 1868, no written instrument was necessary for the transfer of title to real estate. To justify us in upholding such a radical departure from the existing methods of land transfer in this country . from its earliest settlement, we think that it should clearly appear, not only that no written instrument was required by the usages of the civil law, but that the oral transfer was accompanied by all the customary formalities prescribed by that law for the identification of the land and delivery of possession. The question whether an oral transfer of land was recognized as valid by the law of Mexico was not argued upon the hearing of this case, and may be open to some doubt. There appears to be a diversity of opinion upon the point. Upon the one hand, the Supreme Court of California, which State also inherited the civil law from Mexico, has uniformly held that a conveyance of land resting solely upon parol was void by that law. In *Hoen* v. *Simmons*, 1 California, 119, it is said that by the *Recopilacion de las Indias*, Law 29, Liber 8, Title 13, a code of the sixteenth century, every sale of real estate was required to be made before the *Escribano* (Notary) of the place where the contract was entered into; and if there were no *Escribano*, before the Judge of First Instance; and these officers were required to furnish a copy and statement of the writings and contracts made before them, with the day, month, and year in which they were made, the names of the seller and purchaser, the property sold or exchanged, and the price. In the opinion of the court in that case it is said: "There has never been a time since the adoption of the *Fuero Juzgo*," (a Visigothic code of the seventh century,) "in which lands could be conveyed under Spanish or Mexican law, without an instrument in writing — unless it was, perhaps, in the case of an executed contract, where corporeal possession was delivered at the very time of the sale by actual entry upon the premises, and the doing of certain acts analogous to the *livery of seizin* at common law." The question was again fully considered in the case of *Hayes* v. *Bona*, 7 California,

153. It was contended in that case that the civil law, so far as it required transfers of land to be made in writing, was never extended to California; and even if - it were, it never had any force or practical operation there; that the condition of 'the country, its illiterate population, together with the fact there were no *Escribanos*, or Judges of the First Instance, residing in San Francisco, warranted the assumption that the law was never regarded as authoritative, and that evidence of a custom of conveyance existing for many years, by which these requisitions of the law seem to have been disregarded, was sufficient to warrant the court in holding that contracts for the sale of land were in no way controlled by it. "It may be admitted," said the court, "that there is some doubt whether this law was in force in California. From what we can learn, it was a fiscal law, and extended over all the States and Territories of Mexico. That it fell somewhat into disuse, there is no doubt; but, so far as we are informed, contracts for the sale of land, by the custom of the country, were required to be in writing; and, although all the forms prescribed were not strictly followed, still it was necessary that the instrument should contain the names of the parties, the things sold, the date of the transfer, and the price paid. . . . We have been always willing to extend the greatest liberty to contracts executed before the acquisition of California by the United States, and to uphold them, if possible, where there were any equities existing. But to go further, and extend the rule to verbal contracts for the sale of land, or conveyances like the present, would open the door to stupendous frauds and unsettle every title in the State." See also *Stafford* v. *Lick*, 10 California, 12; *Merle* v. *Mathews*, 26 California, 455.

It will be observed in this connection, however, that the court relies largely upon the extract from the *Rècopilaciòn* which appears to have embodied a system of laws applicable to all the Spanish possessions in the Indies. The law referred to seems to have been a mere fiscal regulation, designed for the purpose of securing to the government its *alcabalá*, or excise tax upon the transfer of land, rather than for the pro-

tection of the parties to such transfer. And as there seem to have been no *Escribanos* or Judges of the First Instance in New Mexico, and no tax upon land transfers, it is very doubtful whether this law was ever enforced there. From Schmidt's Civil Law of Spain and Mexico, published in New Orleans in 1851, three years after the treaty of Guadalupe Hidalgo, under which New Mexico and California were ceded to the United States, (book third, title 3, "Contract of sale,") it would appear that no distinction was made between personal and real property, and by article 596, "the sale is perfect from the moment the parties have agreed as to the thing which is to be sold, the price and other particulars," although by article 598 "the sale is not considered complete, when it is stipulated, at the time of making it, that it shall be reduced to writing, until that stipulation is complied with."

It is also said, in the useful and exhaustive work of Mr. Hall upon Mexican Law, page 489, that there was no statute of frauds in Spain or Mexico, and that a verbal sale of real estate was valid. He also speaks of the public writing, (*escritura publica*,) stated by earlier authors to be essential to the sale of real estate, as being a mere fiscal law, created for the purpose of collecting the *alcabalá*, or tax on sales, and that the law did not declare that sales made otherwise should be null and void. "Sales of real estate or contracts in relation thereto, made in the territory ceded by Mexico to the United States, and subsequent to the concession, could not possibly have been affected by such a fiscal law. There was no law in force in the United States authorizing the collection of an *alcabalá*, and no officer had power to collect such an impost. Such a fiscal law could not have been carried into execution in said Territory." See also *Devall* v. *Choppin*, 15 Louisiana, 566; *Gonzales* v. *Sanchez*, 4 Martin, N. S. 657. Important changes were, however, made in the law of Mexico subsequent to the treaty of Guadalupe Hidalgo, and by the Civil Code of 1871 of the Federal District and the Territory of Lower California, which also seems to have been adopted by many of the Mexican States, it was provided, (art. 832,) that "the division of immovable property is void, if it is not made by

public writing;". and (art. 3056) that "the contract of purchase and sale (*compra-venta*) requires no special formality to give it validity, unless it relates to immovable property." By art. 3057, "the sale of an immovable, whose value does not exceed $500, may be made by private instrument, which has to be signed by the vendor and the vendee before two known witnesses." By art. 3059 this instrument was to be executed in duplicate, one for the vendor and one for the vendee, and if the value of the immovable exceeds $500, the sale shall be reduced to a public writing.

In a subsequent chapter a system of public registration is provided, somewhat similar to our own. These provisions are also carried into the Civil Code of December 14, 1883.

It is unnecessary, however, for the purpose of this case, to express an opinion whether under the civil law a transfer of land was valid without a written instrument, since we are of the opinion that the civil law in this particular had been supplanted by territorial enactments.

While no statute of frauds appears to have been adopted in New Mexico as early as 1868, the Compiled Laws of 1865, art. 18, c. 44, required all conveyances of real estate to be subscribed by the person transferring his title or interest, (sec. 4,) and to be acknowledged and certified by a public officer (sec. 5). Although there is nothing in this chapter saying in so many words that no transfer can be made without an instrument in writing, the careful provisions made for the execution and acknowledgment of conveyances of real estate indicate very clearly that written instruments were considered essential.

But, however this may be, and giving full force and effect to all that is claimed for the civil law in this particular, it is very clear that there was no such identification of the land, delimitation of the boundaries, and delivery of possession as were necessary, under the most liberal construction of the civil law, to convey a title. The testimony as to any contract which Maulding and Curtis may have had with Maxwell with regard to the large "block of land," of which a portion claimed by the defendant was a part, was not only hearsay,

but hearsay of the loosest description. Taking Dawson's own version of it, all it amounted to was that Maulding and Curtis told him they had a contract with Maxwell for the purchase of this property, and that he might take a part of it. Neither the property which they purchased nor that which they allowed Dawson to take appears to have been identified in any way beyond the general statement that it included the drainage of the Vermejo River between certain points. If this testimony as to the contract between Miller, Maulding, and Curtis on the one part, and Maxwell on the other, was entitled to any weight whatever, we think the court should have admitted the deeds from Maxwell and wife to Miller and Maulding and to Joel W. Curtis, showing the lands actually conveyed to them, as having a tendency to contradict, or at least to qualify, their general statements. These deeds appear to have been ruled out upon the ground that defendant could not be bound by recitals in deeds between other parties; but, as both the grantors and grantees in these deeds were the parties from whom Dawson himself claimed title, it was competent to show definitely what land was conveyed by Maxwell to Miller, Maulding, and Curtis, from whom Dawson claimed title. Nor was this error cured by the admissions of counsel as to the contents of these deeds, since the deeds themselves were excluded, and the admission was simply for the purpose of enabling the appellate court to pass upon their relevancy in reviewing the action of the trial court in excluding them.

The court below also held that whether the statements of Maulding, Miller, and Curtis, as to their contract with Maxwell, were or were not properly admitted in evidence, was immaterial, from the fact that defendant Dawson further testified that he had conversations with Maxwell, the party from whom they claimed to have purchased, and that Maxwell pointed out the boundaries of the land he would receive under his agreement with Maulding, Miller, and Curtis, who were then in possession. All this conversation amounted to was that Dawson met Maxwell in June, 1868, at a stage station, some four miles from the land in question; that Maxwell pointed out to him the boundaries of the land he would receive

under his agreement with Maulding, Miller, and Curtis; and that some of the permanent objects on the land in question were visible from the spot where they stood. There was no attempt in this conversation to identify the land, to fix the boundaries, or to deliver possession. All he said in this connection was that "the boundaries were what you read in that description there," meaning thereby his plea. There was nothing in the nature of a livery of seizin, which the Supreme Court of California pronounced to be essential to an oral transfer of lands under the civil law. No weight whatever should be given to testimony of this description in connection with the transfer of lands. It is incredible that any man should have paid $3700 for such an indefinite purchase of real estate. A more probable explanation of the transaction was given by Dawson upon his cross-examination, when he produced a deed from Maxwell and wife to himself, bearing date June 7, 1869, in which, for the consideration of $3700, Maxwell conveyed to him the property admitted in this suit to belong to him.

As the location of the dam mentioned in this deed as the upper boundary of the tract conveyed, is admitted, and the piñon tree, which marked its lower boundary "to the right of a ridge, near a wash," was admitted by Dawson to have been seen by him when he first went there, and was on the southwest side of the Vermejo River, near the travelled road up and down the river, and only a little over a hundred yards from the bank of the river, at the southwest end of the stone fence built by the defendant to mark his lower boundary line, there was, and could have been, no uncertainty as to the upper and lower boundaries of his tract. The "pile of rocks, on a knoll or elevation, with some bushes near thereto," to which the line ran from the dam, Dawson swears he never found, and it must be admitted that the side lines of the tract are very vague, and justify the remark made by Morley, the surveyor employed by the plaintiff, when he was shown the deed from Maxwell and wife to Dawson, that there was not a man in the world who could take the deed and survey the land. From the fact, however, that the line was run from a pile of rocks on a knoll or elevation, which could not have been far

from the dam, southward across the river to a piñon tree, and from this tree up the river on the south side to the place of beginning, it is quite evident that it was never intended to include the vast territory claimed by the defendant in his plea, and that the land probably contemplated by the parties was the immediate drainage of the Vermejo River, between the dam and the piñon tree, including all the land between the watersheds on either side of the river, with perhaps grazing privileges over the surrounding territory, which, according to the custom of the country, seems to have been incident to the ownership of the water. If he had purchased all the land he now claims, it is very improbable he would have accepted a deed with this limited and ambiguous description. If he has any title to the territory claimed in his plea, it must be a title by adverse possession. This was evidently the theory upon which he tried his case, though after the deed was introduced, against his objection, he apparently shifted his ground and endeavored to reconcile his claim with the vague description in his deed. It is impossible, however, under any theory of construction, to give it that effect. While possession of the land under the deed would not absolutely conclude him from showing an adverse possession of the much larger tract claimed by him in his plea, the presumption is against him; and, if his testimony as to such possession were reconcilable with his position as grantee under the deed, the theory that he held under the deed, and not by virtue of an adverse possession, should be adopted. This presumption is strengthened by the fact that he appears always to have claimed under his deed up to the time this suit was begun, when, by the filing of his plea, plaintiff was first apprised of the nature and extent of his claim. His disclaimer of holding under the deed is the more apparent from the fact that he made no mention of it in his examination-in-chief; that he exhibited it to his son as the foundation of his title, and produced it to Morley, the plaintiff's agent, as the basis of a survey, when Morley told him it was impossible to locate the land by it. In another part of his testimony he admits that he frequently claimed that, under the deed from Maxwell, he was entitled to the

drainage of the Vermejo River between the dam and the stone fence.

While defendant may have gained a title by adverse possession for ten years, it is difficult to believe that when he went into possession he claimed anything more than the tract covered by the deed from Maxwell, though, having command of the water for a certain distance, he may have treated this as giving him the control of the grazing privileges over a much larger extent of territory.

Under no theory of the case, however, were the loose talks which the defendant had with Miller, Maulding, and Curtis, or with Maxwell, admissible either to fix the boundaries of the deed, or to throw light upon the character and extent of his alleged adverse possession. They were calculated to prejudice the plaintiff's case and to leave an impression upon the jury that defendant's claim of adverse possession was justified by a contract with Maulding, Miller, and Curtis of which there was no legal evidence. The admission of such testimony would create a most dangerous precedent and open up possibilities of fraud that might operate to the unsettlement of great numbers of titles.

It is insisted, however, that this evidence was admissible to supplement the vague and uncertain language of the deed; that it was essential for defendant to explain why he did not claim the Van Bremmer Cañon, and why he did claim the land in controversy; that he could only do this by relating his conversations with Curtis and Maulding in regard to their contract with Maxwell, and that the question at issue was not the actual contents of this contract, but the good faith of Dawson's claim to the land in controversy. The question, however, was one of actuality and continuity of possession rather than of good faith; and even if the good faith of the defendant had been material to this inquiry, it is difficult to see how loose conversations with parties, who, whatever they claimed, were not shown to have had a contract with Maxwell, tended to throw any light upon this question. The difficulty both with this testimony and with that respecting the conversations with Maxwell is that it was likely to lead the jury to believe that

defendant had a title other than that arising from adverse possession.

(2) There was no error in admitting testimony to the effect that the land claimed by Dawson was generally reputed to belong to him. Claiming as he did by open, notorious, and adverse possession of these lands for a period sufficient under the statutes of New Mexico to give him a good title, it was competent to prove that it was generally understood in the neighborhood, not only that he pastured his cattle upon these lands, but that he did so under a claim of ownership, and that his claim and the character of his possession were such that he was generally reputed to be the owner. While this testimony would be irrelevant in support of a paper title, it had an important bearing upon the notoriety of his possession. *Sparrow* v. *Hovey*, 44 Michigan, 63, 64. It may be that, as the tract upon which Dawson lived was admitted to be his property, and the question was one of boundaries or extent of ownership, the testimony may not have been of much value, but we cannot say it was inadmissible. It was a question for the jury to say not only whether his adverse possession, but whether this repute of ownership extended beyond the property included in his deed from Maxwell.

(3) Plaintiff has no just reason to complain of the instruction of the court that the documents introduced by it were sufficient to vest in it the title to the land in controversy, unless they found from the evidence that the plaintiff had failed to prove that the land in controversy, or some portion thereof, was not the whole or part of the 15,000 acres of land excepted in the conveyances under which plaintiff claimed title; or in the further instruction that the burden of proof was on the plaintiff to show that it had the legal title to, and the right of possession of, all the lands in controversy; and, unless they found from the evidence that the lands in controversy were included in and not excepted from the deeds of conveyance under which plaintiff claimed title, plaintiff could not recover.

Under a certain deed from Maxwell and wife to the Maxwell Land Grant and Railway Company, and in all the subsequent

deeds under which plaintiff claims title, there was an exception of such tracts of land "part of the said estate, hereby warranted not to exceed in the aggregate 15,000 acres, which the parties of the first part have heretofore sold and conveyed," etc., and the question was whether the plaintiff was bound to show that the lands claimed by him in this suit had not theretofore been conveyed, or whether the burden was upon the defendant to show that they had been so conveyed. Ordinarily the burden of proof is upon the party claiming the affirmative of the issue. There are, however, certain exceptions to this general rule. Bearing in mind that the burden was upon the plaintiff to show its title to the identical land claimed by the defendant, it is manifest that, as the plaintiff did not take title to 15,000 acres of the Maxwell land grant by reason of the fact that its grantors had already conveyed this amount of land, it was incumbent upon it to show that the land it sued to recover had not been previously conveyed, and, hence, that it had taken title to it under its deeds.

An exception in a grant is said to withdraw from its operation some part or parcel of the thing granted, which, but for the exception, would have passed to the grantee under the general description. The effect in such cases in respect to the thing excepted is as though it had never been included in the deed. If, for example, a person should convey to another a block of land, excepting therefrom a certain lot previously conveyed, to sustain ejectment for any particular lot, it would be necessary for the plaintiff to show that it was not the lot which had been previously conveyed. There is a general rule, applicable both to conveyances and statutes, that where there is an exception in the general granting or enacting clause, the party relying upon such general clause must in pleading state the general clause, together with the exception, and must also show by the testimony that he is not within the exception. Thus in *United States* v. *Cook*, 17 Wall. 168, it was held that if the ingredients of a criminal offence could not be accurately described, if the exception in the statute were omitted, an indictment founded upon the statute must allege enough to show that the accused was not within the exception; but that, if the

language of the statute defining the offence were so entirely separable from the exception that the ingredients constituting the offence might be accurately defined without reference to the exception, the indictment might omit such reference — the matter contained in the exception being matter of defence, and to be shown by the accused. See also *Steel* v. *Smith*, 1 B. & Ald. 95, 99; *Vavasour* v. *Ormrod*, 6 B. & C. 430; *Commonwealth* v. *Hart*, 11 Cush. 130; *Commonwealth* v. *Jones*, 121 Mass. 57; *State* v. *Abbey*, 29 Vermont, 60, 66; *Myers* v. *Carr*, 12 Michigan, 63; *Lynch* v. *People*, 16 Michigan, 472. But, as said by Chief Justice Cooley of the Supreme Court of Michigan in *Osburn* v. *Lovell*, 36 Michigan, 246, 250: "This is not always a rule of pleading; it is sometimes a rule of evidence only. It goes no further in any case than to require the party relying upon the exception to present the facts in such form as the case requires; and this may or may not be by special pleadings. . . . Whether special pleadings are necessary must be determined by other considerations and by the general rules of pleading."

But the exact question raised by the exception in this case was considered by this court in *Hawkins* v. *Barney's Lessee*, 5 Pet. 457, where a patent was issued for 50,000 acres of land, and by subsequent conveyance the patentee sold small parts of said land, and particularly one parcel of 11,000 acres, within the bounds of the original survey; and it was held, that to sustain an action of ejectment it was necessary for the plaintiff to show that the land he sought to recover was without the limits of the tract shown to have been conveyed away by himself. The court quoted with apparent approval the case of *Taylor* v. *Taylor*, 3 A. K. Marsh. 18, 20, in which the Supreme Court of Kentucky held that a plaintiff in ejectment, claiming under a deed conveying the balance of a tract of 14,000 acres of land, must show what that balance was, and where situated, and that it included the land in contest. Also the case of *Madison's Heirs* v. *Owens*, 6 Littell, 281, where, to recover in ejectment, it was held to be necessary for the patentee to show that the defendant was not within the bounds of certain claims excluded from the language of his patent. See also

*Guthrie* v. *Lewis' Devisees*, 1 T. B. Mon. 142, in which a simi-
lar ruling was made.

These cases are precisely in point, and show that the court
was guilty of no error prejudicial to the plaintiff.

Defendant, however, claims that, as the plaintiff made no
effort to prove himself without the exception, the judgment of
the court ought, irrespective of every other consideration, to
be affirmed. It is true that the court may have erred in not
granting the motion of the defendant made at the close of the
plaintiff's case to direct a verdict for him upon that ground, as
there does not seem to have been any testimony offered by the
plaintiff, in making his original case, to show that the land in
controversy was not within the exception; but the defendant
is in no condition now to take advantage of it, as the instruc-
tion actually given was given upon the request of the defend-
ant himself. While the plaintiff has no right to complain of
this instruction, it does not necessarily follow that defendant
is entitled to an affirmance of the judgment because the charge
of the court was not sufficiently favorable to him in that par-
ticular, when such charge was made upon his own request.
In putting in its rebutting testimony plaintiff did put in evi-
dence the deeds of Maxwell and wife to Maulding and Curtis,
but they were not offered for the purpose of proving itself
without the exception, but for the purpose of contradicting
the testimony of defendant as to his conversations with Maul-
ding and Curtis, and it is too late for it now to claim that they
were offered for the purpose of proving itself without the
exception.

(4) Plaintiff also complained of the instruction of the court
upon the subject of the statute of limitation, namely, that if
the plaintiff permitted defendant to take possession of the
tract, claiming all of it as his own, and to continue such pos-
session adversely under such claim of title for an uninterrupted
period of ten years or more, such possession would ripen into
a right and title in the defendant, and forever afterwards pre-
vent the plaintiff from taking possession of the property. We
think, however, the instruction complained of was justified by
the language of the statute, which provides (Comp. Laws New

Mexico of 1884, § 1881) that " no person, or persons, nor their children, or heirs, shall have, sue, or maintain any action, or suit, either in law, or in equity, for any land . . . but within ten years next after his, her, or their right to commence . . . such suit shall have . . . accrued, and that all suits . . . shall be had and sued within ten years next after the title or cause of action, or suits, accrued or fallen, and at no time after the ten years shall have passed." Under similar statutes it has been held by this court that the lapse of time not only bars the remedy, but extinguishes the right, and vests a complete title in the adverse holder. See *Leffingwell* v. *Warren*, 2 Black, 599; *Croxall* v. *Shererd*, 5 Wall. 268, 289; *Probst* v. *Presbyterian Church*, 129 U. S. 182. In the last case this court held, construing the statute of New Mexico here in question, that the defendant was entitled to an instruction that an uninterrupted occupancy of land by a person, who in fact has no title thereto, for a period of ten years adversely to the true owner, operates to extinguish the title of the true owner thereto and vest the title of the property absolutely in the occupier.

But for the error of the court specified in the third assignment, in admitting the testimony of the defendant as to the statements of Miller and Curtis, the judgment of the court below must be

*Reversed, and the case remanded with instructions to set aside the verdict and grant a new trial.*