## 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

### HARMAN V. STEARNS.

JULY 8, 1897.   REHEARING JULY 22, 1897.

1. FOREIGN JUDGMENTS—*Bankruptcy Proceedings—Considered as a Whole—Collateral Attack.*—The record of the proceedings of a District Court of the United States showing that a commission in bankruptcy issued in 1801 was vacated in 1830 must be read as one entire and connected suit, and is admissible in evidence in the courts of this state to show that the adjudication in bankruptcy should be disregarded. The judgment of that court cannot be attacked collaterally.

2. DEEDS OF RELEASE—*How far Effectual—Grantor not in Possession.*—Under the provisions of section 2439 of the Code a release deed is effectual to convey all the right, title, and interest of the grantor in the premises released, whether he were at the time in the possession of the premises or not.

3. DEEDS—*Recitals—Grantor, a Widow.*—The recital in a deed made in 1851 that the grantor therein is a widow will be accepted as true, in the absence of evidence to the contrary, although it appears from a will under which she claims title that she was a married woman in the year 1804.

4. DEEDS BY COMMISSIONER OF COURT—*Departure from Directions—Subsequent Confirmation by Court.*—Although a deed made by commissioners of a court is not in exact accordance with the directions of the court, yet it is immaterial where it appears that they reported their action to the court, and it confirmed the deed.

5. DELINQUENT LANDS—*Redemption—Certificate of Auditor as to Payments—Presumption as to Who Redeemed.*—The certificate of the Auditor of Public Accounts showing the payment of money for the redemption of lands returned delinquent for the non-payment of taxes for the years 1796, 1797, and 1798 is admissible in evidence as tending to show redemption of the land from forfeiture; and the fact of the payment and the receipt of the money by the Commonwealth, in the absence of evidence to the contrary, is sufficient

Opinion.

evidence of the fact that the payment was made by or for some one entitled to redeem the land.

6. EJECTMENT—*Lands Excepted from Grant—Burden of Proof—Case at Bar.*—The burden of proof is on the plaintiff in ejectment to show that the land claimed by him is not within the reservation of the grant from the Commonwealth, under and through which he traces his title. He must recover upon the strength of his own title. In the case at bar one of the deeds under which the plaintiff claimed excepted all lands which had theretofore been aliened by the grantor, and which were not then in his possession. Hence it was necessary for the plaintiff to show that the land sued for had not already been aliened by such grantor at the time of his conveyance. The evidence of a witness that he was acquainted with the tract, and that he knows that large parts of it had been in the actual possession of said grantor and those claiming under him since the year 1856, and were still in his possession, was not of itself sufficient to justify a finding for the plaintiff.

Error to a judgment of the Circuit Court of Smyth county rendered December 14, 1894, in an action of ejectment wherein the defendant in error was the plaintiff, and the plaintiff in error was the defendant.

*Reversed.*

The opinion states the case.

*J. H. Fulton,* for the plaintiff in error.

*Jos. W. Caldwell* and *Walker & Caldwell,* for the defendant in error.

KEITH, P., delivered the opinion of the court.

Franklin Stearns instituted an action of ejectment against William N. Harman, defendant, for the recovery of a tract of land. When the case came on for trial upon the defendant's plea of "not guilty," a jury was waived, and all matters, both of law and fact, by consent of counsel, were submitted to the court, which, after hearing the evidence, entered a judgment for the plaintiff for the premises in the declaration mentioned.

The plaintiff's claim of title is deduced from Robert Morris, who, in May, 1794, obtained a grant from the Governor of Virginia for 5,000 acres of land in the county of Wythe, described by metes and bounds. Robert Morris died in 1807, and by his will, which was dated June, 1804, he devised all of his real estate to his wife, Mary Morris, who, by her will dated October, 1824, devised this land to her daughter, Maria Nixon, who, by deed dated January, 1851, remised, released, and forever quit claim unto Phineas Thurston all of her right, title, and interest to the land in the declaration mentioned. Thurston conveyed to Edward Shelly by deed dated January, 1873, and Kent and Caldwell, commissioners appointed by a decree of the Circuit Court of Wythe county, at the September term, 1882, in the chancery causes of *Franklin Stearns* v. *Phineas Thurston and others* and *Phineas Thurston and others* v. *Shelly and others*, on a cross-bill, conveyed this land to Franklin Stearns, the defendant in error here.

This apparently constitutes a complete chain of title from the Commonwealth to the defendant in error, but the exceptions presented by the plaintiff in error to this court point out alleged defects, which it now becomes our duty to investigate.

It seems that Robert Morris was in 1801 adjudicated a bankrupt by proceedings under the Bankrupt Act of 1800 instituted in the District Court of the United States for the Pennsylvania district, and which are still of record in that court. The commissioners provided for in the Bankruptcy Act were appointed with the approbation of the creditors, and Robert Morris was, by the commission, duly adjudicated a bankrupt, in November, 1801, and this action of the commission was, in December of the same year, approved by the judge of the District Court.

Assignees in bankruptcy were selected by the commissioners to whom all the property of Robert Morris was conveyed "in trust, nevertheless, and to and for the several uses of all such creditors of the said Robert Morris, who have already sought or shall hereafter in due time come in and seek relief by virtue of

the said commission, and to and for no other use and intent whatsoever."

As far as the record discloses, nothing was ever done by the commissioners and assignees in bankruptcy in execution of the duty reposed in them to collect the assets of Robert Morris, and apply the proceeds thereof to the satisfaction of his creditors. Robert Morris died, as we have seen, in 1807. In November, 1825, Henry Morris filed his petition in the District Court for the Eastern District of Pennsylvania, asking that the judgment of bankruptcy against Robert Morris might be vacated. He avers in his petition that in July, 1801, upon the petition of John Houston, a commission of bankruptcy was awarded against his father, Robert Morris, directed to John Hallowell, Joseph Hopkinson, and Thomas Compston; that the commission was opened July 31, 1801, and that Robert Morris was on the same day declared a bankrupt; that after due advertising the creditors met and proved debts to a large amount, and made choice of assignees in bankruptcy, to whom the whole of the estate and effects of the bankrupt were assigned; that the assignees do not appear to have accepted the trust; and that there has been nothing further done in the premises; that, at the time of his bankruptcy, Robert Morris was possessed of a large estate, real and personal, which, in consequence of the neglect of the creditors and assignees in not duly prosecuting the commission, has been wasted without benefit to the creditors or the bankrupt. The petition prays that the commission of bankruptcy may be vacated and superseded.

Notice having been given to the petitioning creditors, the court on September 17, 1830, entered an order "that the commission issued in this case be vacated and superseded according to the prayer of the petition."

From that time forward this order of the District Court has remained unquestioned, and, as it is to be presumed, been accepted and acquiesced in by all concerned. It is true that it was entered after the Bankruptcy Act of 1800 had been repealed,

but the act of repeal provides "that the repeal of the said act shall in no wise affect the execution of any commission of bankruptcy which may have been issued prior to the passing of this act, but every such commission may and shall be proceeded on as though this act had not passed."

The attempt here is to attack and impeach this judgment or decree of the District Court of Pennsylvania, in a collateral proceeding, nearly seventy years after it was entered. We are of opinion that the record of the proceedings in bankruptcy, constituting, as they do, one entire and connected suit from the filing of the petition to the final settlement of the cause, was admissible evidence to be considered by the court exercising in this case the functions also of a jury, and, in the absence of anything to the contrary, justified the court in disregarding the adjudication of the bankruptcy of Robert Morris in so far as that was relied upon to defeat the title of the devisees under his will. See *Sandusky* v. *National Bank*, 23 Wall. 289.

Objection is taken to the deed from Maria Nixon; first, because the deed is a technical release, and Mrs. Nixon not appearing to have been in possession, it could not pass title.

We think, in answer to this objection, that it is only necessary to cite section 2439 of the Code, which declares that "whenever in any deed there shall be used the words: 'The said grantor releases to the said grantee all his claims upon the said lands,' such deed shall be construed as if it set forth that the grantor hath remised, released, and forever quitted claim, unto the grantee, his heirs, or assigns all right, title, and interest whatsoever, both at law and in equity, in or to the lands and premises granted (or released), or intended so to be, so that neither he nor his personal representative, his heirs, or assigns, shall at any time hereafter, have, claim, challenge, or demand the said lands and premises, or any part thereof, in any manner whatever."

Secondly, because it appears from the will of Robert Morris that in 1804 Maria Nixon was a married woman.

It is conceded that the deed of 1851 is not sufficient to convey the lands of a married woman, but that deed recites that at its date Maria Nixon was a widow.  If she was a married woman in 1804, while there may be no presumption of the death of her husband, the lapse of time far exceeding (as is pointed out in the excellent opinion of the learned Judge of the Circuit Court), his expectation of life, according to the table of mortality, diminishes the *quantum* of proof necessary to establish his death.  The deed, as we have seen, recites that she is a widow. If this recital is untrue, it must have been falsely and fraudulently made, while the presumption is always in favor of innocence and fair dealing.  The declaration of widowhood necessarily implies, of course, the death of her husband; is made by one presumed to be acquainted with the facts; has remained unchallenged by proof, though susceptible of easy contradiction, and comes within the class of declarations which have been generally admitted by the courts.  See *Gaines* v. *Stiles*, 14 Peters 322; *Deery* v. *Gray*, 5 Wall. 95; and *Fulkerson* v. *Holmes*, 117 U. S. 389.  These authorities are all cited and relied upon in the opinion of the Judge of the Circuit Court, and we think fully sustain the conclusion there reached that the deed was admissible in evidence, and that, in the absence of evidence to the contrary, it is sufficient to support the judgment of the court upon this point.

Nor do we think the objection to the deed from Kent and Caldwell, commissioners, to Franklin Stearns, can be sustained. Conceding that the deed is not in exact accordance with the directions of the court, yet it appears that the commissioners reported what they had done to the court, which confirmed the deed, and it cannot now be assailed in this manner.  *Evans* v. *Spurgin*, 6 Gratt. 107; *Robertson* v. *Smith*, 94 Va. 250.

The most serious contention on the part of the plaintiff in error is that these lands were forfeited to the State for non-payment of taxes, and have never been redeemed.

In the investigation of this branch of the case especially we

have received much assistance from the opinion of the Judge of the Circuit Court, to which we have already referred. It must be remembered that this case was submitted to the court without the intervention of a jury, and we are only called upon to inquire, first, whether evidence was admissible where its admission was objected to; and secondly, whether weighed by the rules applicable to a demurrer to the evidence it was sufficient to warrant the judgment of the court. It is without doubt true that there is evidence to show that the land in question was forfeited to the Commonwealth for non-payment of taxes in the years 1796, 1797, 1798, and that it so remained until 1815; that by virtue of proceedings under the Act of 1814 this land vested in the literary fund, and so remained until 1826, when it was restored to the commissioner's book in the name of Robert Morris, and so continued until 1832.

Without discussing in detail the several statutes applicable to the subject, it appears that by the act of 1832 all delinquent taxes were released, including those for land which had vested in the literary fund, where the lands lay east of the Blue Ridge, and those upon the land lying west of the Blue Ridge, where the amount was not in excess of $20.00. It reduced the interest on all delinquent taxes from ten to six *per cent.*, and made all lands, which prior thereto had vested in the literary fund, redeemable at any time before the 1st of April, 1834, by paying into the Treasury the taxes and damages for which the same were forfeited, together with six *per centum per annum* from the time of such forfeiture. The act of March 11, 1834, extended the time for redemption to the 1st of October, 1834.

There are numerous certificates from the Auditor's office introduced into the record, which tend to prove that this land, though forfeited, had been redeemed. Morton Marye, Auditor of Public Accounts, certifies as of the 2nd of March, 1887, that this land was returned delinquent for the years 1796, 1797, 1798, 1799, and 1800; that it does not appear on the land books from 1800 to 1826; that when it again reappears during the

years 1827, 1828, 1829, and 1830, it is assessed to Robert Morris and that in a book on file in his office described as a "List of lands forfeited to the president and directors of the literary fund," the following entries appear:

Robert Morris, 75,000; 1,500 part of this tract redeemed 21st March, 1834, by Jeremiah Price for the years 1796-'97-'98. Taxes and damages on this tract $110, paid in part of the redemption of this tract 29th June, 1829, for the years 1796-'97-'98, and from 1815 to 1828, and then follows another:

Robert Morris, 75,000; tax and damages on this tract, $125.31, in redemption of the residue of the tract 12th September, 1834, for the years 1796, 1797, 1798.

It will be recalled in connection with this payment on the 12th of September, 1834, that by the act of March 11, 1834, the time for the redemption was extended to the 1st day of October of that year.

By a certificate from the same Auditor of date 19th of September, 1889, it appears that on the 21st day of March, 1834, the sum of $5.45 was paid by Jeremiah Price for the redemption of part thereof, on account of taxes and damages thereon, for the years 1796, 1797, 1798, 1799, and 1800; that on the 29th of June, 1829, the sum of $110.00 was paid towards the redemption of the said tract on account of taxes and damages thereon for the years 1796, 1797, 1798, 1799 and 1800; and that on the 12th of September, 1834, the sum of $125.00 was paid by Messrs. Hugh and J. J. Fry, for a company of gentlemen in New York, for the years 1796, 1797, and 1798.

The following language from the opinion of the Circuit Court Judge seems to be fully borne out by the facts. Speaking of the act of March 11, 1834, he says: "If we follow its language, to have redeemed this land would have simply required the payment into the treasury of the taxes and damages for which it was forfeited, with interest thereon from the time of the forfeiture, *i. e.*, $54.95 (taxes, and 10 per cent. damages), with interest either from 1798, time of forfeiture, or from 1815,

time of vesting in literary fund. But to adopt either of these literal constructions will not consume near all the money paid."

There are several other certificates from the Auditor's office containing entries of a like tenor with those above given, but enough has been quoted to show that the evidence was admissible as tending to prove the redemption of these lands from the for-feiture which they had incurred for non-payment of taxes to the Commonwealth.

It is true that the introduction of these certificates was objected to on the ground that it does not appear that the payments were made by any one claiming title under Robert or Mary Morris, but, if made at all, were made by strangers to the title claimed by the plaintiff. We are of opinion that, where land had been forfeited to the Commonwealth for non-payment of taxes, and the taxes were subsequently paid in redemption of the land, and were received by the Commonwealth for that purpose, a jury, or, in this case, the court, would be warranted in inferring under the circumstances that the payment was made by or for some one having the right to redeem in the absence of anything to the contrary.

This brings us to the consideration of the only remaining question. In the grant from the Commonwealth to Robert Morris there occurs the following reservation:

"But it is always to be understood that the survey upon which this grant is founded, includes 1,500 acres, which, having a preference by law to the warrants and rights upon which Robert Morris' survey is founded, liberty is reserved that said 1,500 acres shall be firm and valid, and shall have the same effect, and may be carried into grant or grants, and this grant shall be no bar in either law or equity to the confirmation of the title as before mentioned and reserved with its appurtenances."

And in the deed from Thurston and wife to Shelly, there is the following provision:

"But nothing in this covenant shall be construed to entitle said Edward Shelly to claim of said Phineas Thurston anything

on account of the value of any parcel of said land heretofore
directly alienated by said Phineas Thurston, and not now in his
possession.

And in the deed from Kent and Caldwell to the defendant in
error there is conveyed so much of the tract of 75,000 acres,
in the bill and proceedings mentioned, as was conveyed by
Phineas Thurston to Edward Shelly by deed of January 1, 1873.

The plaintiff in error claims that by force of the reservation
and provisions in the grant from the Commonwealth, and in the
deeds from Thurston to Shelly, and from Kent and Caldwell to
Stearns, it was the duty of the defendant in error to show that the
lands claimed by him, though embraced within the exterior
boundaries of the grant from the Commonwealth, were not
covered by any of the reservations contained in that grant, and
the deeds referred to.

The contention of the defendant in error is that if the land
sued for was within one of the reservations set out in the title
papers, it was a proper matter of defence, and that the burden
of showing it was upon the defendant in the court below, and the
plaintiff in error here.

The question, therefore, resolves itself into this: Upon whom
was the burden of proof ? Upon the plaintiff to show that the
land for which he sued was within the boundaries of his title
papers, and not within the reservation therein contained; or was
it upon the defendant to show that the land in controversy was
within the reservations?

This case was decided in the Circuit Court in 1894. It held
that the burden of proof was upon the defendant. This court,
in the case of *Reusens* v. *Lawson*, 91 Va., at page 226, con-
sidered and decided this question. In the opinion all the cases
relied upon by the Judge of the Circuit Court and by the
defendant in error here were carefully reviewed, and the con-
clusion reached, "both upon principle and authority, that
where the exterior boundaries of a survey upon which a grant or
deed is founded include lands which have been excepted from

the operation of the grant, or lands which have been aliened since the grant was issued, and which have been excepted from the operation of the deed, and the plaintiff's title papers disclose such exceptions or such alienation, it is not sufficient for such plaintiff, in an action of ejectment, to connect himself with the Commonwealth, and show the exterior boundaries of his grant, but he must also prove that the lands in controversy are not within the excepted or aliened lands, in order to make out a case which will entitle him to recover in an action of ejectment."

This rule may operate harshly in some instances. There are few rules that do not; but in answer to this objection urged to the decision in *Reusens* v. *Lawson, supra,* and the cases there cited, we cannot do better than again quote from it.

"It is said that to require the plaintiff to assume such a burden imposes upon him a great hardship, if not an impossible task. If it does, it was self-imposed. He, or those under whom he claims, took the grant with the exception in it. There would have been little difficulty in locating the excepted lands, and the grantee's own land, when the grant issued. The facts upon which the exception depends were within the knowledge of the plaintiff, or those under whom he claims. If he, or those under whom he claims, have delayed ascertaining the boundaries of these excepted lands, and the boundaries of his own land, until the means of doing so have been lessened or lost, he cannot complain, as it is the result of his or their negligence. At least, well settled rules of law ought not to be departed from in order that a party in possession of land may be deprived of that possession by another who does not show that he has the legal title to or the right to the possession of it."

That case, we repeat, reviews all the authorities accessible to us upon this subject, and all that have been cited by counsel for defendant in error in this case, with the exception of *Roan Mountain Steel & Iron Co.* v. *Edwards,* (Supreme Court of North Carolina), 14 S. E. Rep. at page 861, and the case of *Gudger* v. *Hensly,* 82 N. C. 481.

In the State of North Carolina, and we believe in Tennessee also, a rule contrary to that announced in *Reusens* v. *Lawson* has been established, but should we follow the decisions of those States we would be not only required to reverse *Reusens* v. *Lawson*, but would be equally at variance with the decisions of this court in *Nichols* v. *Covey*, 4 Randolph 365, and the case of *Carter* v. *Hagan*, 75 Va. 557.

Upon the whole case, we are of opinion that there is no error in the judgment of the Circuit Court, save upon the point last stated, but that the court erred in holding that the burden of proof was upon the plaintiff in error to show that the land sued for was covered by the exceptions and reservation disclosed in the title papers of the defendant in error, and its judgment must, for this reason, be reversed, and this court will enter such judgment as the Circuit Court ought to have rendered.

*Upon a Petition to Rehear.*

KEITH, P.

This case was disposed of at a former day of this term, and is now before us upon a petition to rehear the judgment then rendered.

A plaintiff in ejectment must recover upon the strength of his own title. He cannot rely upon any infirmity in the title of the defendant.

Plaintiff in the court below accepted a title, the first link in the chain of which consisted of a patent granted by the Commonwealth for a tract of land, described by metes and bounds, containing 75,000 acres. In the grant there is the following reservation: "It is always to be understood that the survey upon which this grant is founded, includes 1,500 acres, which, having a preference by law to the warrants and rights upon which Robert Morris' survey is founded, liberty is reserved that said 1,500 acres shall be firm and valid, and shall have the same effect, and may be carried into grant or grants, and this grant shall be no bar in either law or equity to the confirmation of the title as before mentioned and reserved with its appurtenances."

This court decided in *Nichols* v. *Covey*, 4 Rand. 365; *Trotter* v. *Newton*, 30 Gratt. 582; and notably in *Carter* v. *Hagan*, 75 Va. 557, that the title to the land thus reserved remains in the Commonwealth, and does not pass to its grantee. This is settled law in this State, if law can be settled by decisions. This being so, and the burden of proof resting upon the plaintiff to make out his case and recover upon the strength of his own title, the rule announced in *Reusens* v. *Lawson*, 91 Va. 226, that the burden of proof is upon him to show that the land he seeks to recover is not within the exception, seems to follow as a logical necessity. The contrary rule would enable the plaintiff to call upon the defendant to assist him in removing the difficulties out of his way, and require the defendant to become the auxiliary of the plaintiff, and supply by his proof what the plaintiff had failed to establish by his own. We reiterate, therefore, the statement in the opinion in *Reusens* v. *Lawson* that the rule established in that case upon this point is sustained, both by reason and authority. But apart from the proposition announced in *Reusens* v. *Lawson*, which is so much controverted, and, conceding for the sake of argument, and for argument's sake only, with respect to the reservation in the grant from the Commonwealth, that the burden of proof should have been imposed upon the defendant in the court below to show that the land claimed by him was within the exception set out in the grant, it would not avail the defendant in error in this case. In his chain of title there is a deed from Thurston and wife to Shelley, in which it is expressly declared that "nothing in this covenant shall be construed to entitle said Edward Shelley to claim of said Phineas Thurston anything on account of any parcel of said land heretofore directly alienated by said Phineas Thurston, and not now in his possession"; and the deed from Kent and Caldwell, commissioners, to Franklin Stearns only purports to convey "lands not aliened by the said Phineas Thurston prior to his said deed to Edward Shelley."

Whatever diversity of opinion may exist as to the law as

stated in *Reusens* v. *Lawson*, it is apprehended that few will be found ready to maintain that the plaintiff in this case was entitled to recover until he had shown that the land for which he sued had not already been alienated by those under whom he claims. If such there be, they are referred to the opinion of Mr. Justice Brown in the case of *Maxwell Land Grant Co.* v. *Dawson*, 151 U. S. 586, where it is said: "An exception in a grant is said to withdraw from its operation some part or parcel of the thing granted, which, but for the exception, would have passed to the grantee under the general description. The effect in such cases in respect to the thing excepted is as though it had never been included in the deed." And in the same case (citing *Hawkins* v. *Bonney*, 5 Peters 457), where a patent was issued for 50,000 acres of land, and by subsequent conveyance the patentee sold small parts of said land, and particularly 11,000 acres within the bounds of the original survey, it was held "that to sustain an action of ejectment it was necessary for the plaintiff to show that the land he sought to recover was without the limits of the tract shown to have been conveyed away by himself."

This proposition indeed flows inexorably from a principle which may be said to be axiomatic that in actions of ejectment the "burden is upon the plaintiff to show his title to the *identical land claimed by the defendant.*" *Maxwell Land Grant Co.* v. *Dawson, supra.*

If, therefore, the plaintiff could have been relieved of the burden imposed in the reservation made in the grant from the Commonwealth to Robert Morris, under whom he claims, the exceptions in the deeds of land alienated by Phineas Thurston would have been fatal to his pretensions upon the case as made by him in the Circuit Court.

But it is said in the petition that the court did not consider the evidence of James A. Walker. His testimony is to the effect that he was acquainted with the Morris tract of land, and that he knows that large parts of said tract on the south side of the mountain in the county of Pulaski had been in the actual

possession of Phineas Thurston, and those claiming under him since the year 1856, and were yet in his possession.

Had this case been tried before a jury, and had instructions been offered as was done in the case of *Reusens* v. *Lawson* upon the subject of adverse possession, this evidence would, perhaps, have been sufficient to render it proper for the court to give an instruction upon the law of adverse possession; but surely no one will contend that the evidence of James A. Walker was in itself sufficient to justify the court in finding that the plaintiff was entitled to recover upon it. This case was submitted to the Circuit Court without the intervention of a jury, and, in reviewing the record, we are controlled by section 3485 of the code, which is as follows: "The appellate court shall affirm the judgment, decree, or order, if there be no error therein, and reverse the same, in whole or in part, if erroneous, and enter such judgment, decree, or order, as the court whose error is sought to be corrected ought to have entered."

We are of opinion that there is error in the judgment of the Circuit Court, and we must enter such judgment as that court should have entered. Without doubt, upon the evidence adduced before it, that court should have entered judgment for the plaintiff or for the defendant. There was no middle ground for it to occupy. We think it erroneously decided for the plaintiff, and, so thinking, we have no choice but to reverse it, and give judgment for the defendant. There is no alternative.

*Reversed.*