TOGIA'I of Tula; LOGO S. for Pua'atu'ua and Salanoa family
of Tula, Plaintiffs

v.

AUMUA of Tula, Defendant

No. 15-1951

High Court of American Samoa

Civil Jurisdiction, Trial Division

[Land: "Si'ufanua" in Tula]

October 4, 1951

ARTHUR A. MORROW, *Chief Justice;* M. TIUMALU,
*District Judge;* and LETULIGASENOA, *District
Judge.*

3

## DECISION

Heard at Fagatogo on September 13 and September 14, 1951.

Meauta for Togia'i; Logo for the Pua'atu'ua and Salanoa family; Lutu for Aumua.

MORROW, *Chief Justice.*

On July 25, 1950 Aumua of Tula filed his application with the Registrar of Titles to have the land designated SI'UFANUA in the survey accompanying the application as the communal property of the Aumua family. On August 24, 1950 Togia'i filed an objection to the proposed registration claiming that part of the land included within the survey was the property of the Togia'i family. On September 20, 1950, Logo, a member of the Salanoa family and a former holder of the Pua'atu'ua title, filed an objection in the name of the Pua'atu'ua and Salanoa family claiming that certain parts of the land included in the survey were the property of that family. Hence this litigation. See Sec. 905 A. S. Code.

Prior to the hearing the Court viewed the land in the presence of the parties concerned in order that it might have a better understanding of the evidence when it should be presented at the hearing.

Togia'i while on the witness stand denied that there was any such family as the Salanoa family. He said there was a Iuli family instead. There was much testimony contrary to this, and it is our conclusion from the evidence that there is a Salanoa family and that such family has four matais, namely, Salanoa, the senior matai, Iuli, Togia'i and Pua'-atu'ua.

When the "Salanoa family" is referred to hereafter it will be understood that it means the Salanoa family having

4

these four last-mentioned matais. When the word "survey" is used hereafter it means the survey filed by Aumua with his application to register the land designated SI'UFA-NUA therein.

The land as shown in the survey is divided into four parts: (1) the first part lying east of the main road on which part is located the LDS church, (2) the second part lying west of the east side of the main road and extending therefrom to the more easterly rock wall, (3) the third part lying between the last-mentioned rock wall and another rock wall to the west thereof, and (4) the fourth part lying immediately west of the last-mentioned rock wall.

■ The LDS church of Tula is located on the first part; also three pastor's houses and a number of coconut trees. The Salanoa who died about 1937 is buried at the southwest corner of the church. Both Togia'i and Aumua testified that he Salanoa was buried there at his (the Salanoa's) request since he was connected with the LDS church and that his burial place was not on Salanoa land. Aumua testified it was on his land while Togia'i said it was on his. Salanoa said it was on Salanoa land. The Court is thoroughly familiar with Samoan customs and we judicially know that it is the custom to bury a matai on his own family land and not on that of some other family. Aumua claimed that all of the land east of the main road included in the survey (i.e. the first part) was his property and dedicated by him to the LDS church for church purposes. Togia'i claimed that the southern half of such land was dedicated by his predecessor in title to the LDS church for church purposes. Witnesses for the Salanoa family claimed that the Salanoa buried at the southwest corner of the church had dedicated to the LDS church for church purposes that part of the surveyed tract lying east of the main road and south of a dividing line running through the middle of the church lengthwise.

5

After due consideration of all the evidence the Court is convinced that the Salanoa family has been in possession of and using that part of the surveyed tract lying south of a line running lengthwise through the middle of the LDS church for many years, certainly many more than twenty, with the exception that that part of such land lying south of such line and east of the main road has been used by the LDS church for church purposes since 1936 when the church was erected.

Togia'i has a round guest house most of which is located on that part of the surveyed land lying south of such line and west of the main road as shown on the survey. However, we are convinced from the evidence, and also since Togia'i is a member of the Salanoa family and one of its matais, that his possession of the land on which such guest house is located is to be referred to his membership in the Salanoa family; that he occupies such by virtue of such membership and not as the Togia'i separate and independent from the Salanoa family. The aforesaid dividing line running through the middle of the LDS church lengthwise is 298 feet long with a bearing of N 66°30′ E. The east end of such dividing line terminates in the eastern boundary of the surveyed tract which boundary has a bearing S 32°48′ E as shown on the survey. The west end of such dividing line terminates at a point 67 feet west of the point of beginning (the concrete monument) as shown on the survey, and lies in the boundary having a bearing of S 88°19′ W, as marked on the survey.

Togia'i has two living houses and a cookhouse on the second part of the surveyed tract which lies between the east side of the main road and the more easterly rock wall as shown on the survey. The testimony of Togia'i was to the effect that the first cookhouse on the spot where the present cookhouse is located was built in 1910; that the present cookhouse is the fourth one built upon such spot.

6

He also testified that a living house was built in 1910 upon the spot where the more westerly living house now stands; that such present living house is the fifth on such spot. He, further testified that a living house was built in 1920 upon the spot where the more easterly living house now stands, and that a number of living houses had been erected on such spot since, these two living houses and the cookhouse and their predecessors all having been built, used, and occupied by members of the Togia'i family. Tiamanu, a witness for Aumua, testified that all of the present Togia'i's children were born in one or the other of these two living houses. Togia'i's oldest daughter testified she was 24 years of age, and her appearance indicated that such was the fact. Aumua himself testified that the Togia'i people had been in possession of this particular part of the surveyed tract on which these two living houses and the cookhouse are located for between 17 and 18 years. We are convinced that the weight of the evidence is to the effect that the Togia'i people have possessed this part of the surveyed tract for more than 20 years, and that such possession has been actual, open, notorious, peaceable, exclusive, hostile, and continuous under a claim of title during such time. Under the doctrine of acquisition of title by adverse possession the title to this part of the property would be vested in the Togia'i family at the end of twenty years of such possession. *Maxwell Land Grant Co. v. Dawson*, 151 U.S. 586, 607; *Perry v. Clissold*, (1907) App. Cases, 72; *Puailoa v. Leapaga*, No. 64-1948 (Am. Samoa); *Vaimaona v. Mulitauaopele S.*, No. 57-1948 (Am. Samoa); IV Tiffany on Real Property (3rd ed.), Sec. 1171. "A presumption of ownership or title is derived from the possession of real property, the probative weight or force thereof being independent upon the duration of the possessor's tenure. The universal favor which this presumption enjoys is evidenced by legislative recognition in substantially all juris-

7

dictions. Such recognition takes the form of express enactments, statutes of limitations, and the innumerable procedural statutes for establishment of title by adverse possession, and the like." 1 Jones on Evidence in Civil Cases (4th ed.) Sec. 75. "The possession of real property during a prolonged period affords ground for a presumption that the possessor has held under a grant. . . . Accordingly where it is shown that there has been adverse possession of land during twenty years or the period fixed by the statute of limitation, a presumption will be indulged that the possessor or some grantor had a deed and that all acts necessary to give it effect had been performed." Id., Sec. 76. Sec. 907 of the American Samoan Code fixes the period governing the acquisition of title by adverse possession at twenty years.

▉ If the Togia'i family cleared this particular part from the bush and occupied it under a claim of ownership they became owners of it through the acquisition of an original title by first occupation in accordance with Samoan customs. *Faataliga v. Fano*, No. 80-1948 (Am. Samoa). Also see 2 Blackstone 8; Maine's Ancient Law (3rd. Am. ed.) 238. As far as the instant decision is concerned it makes no difference whether the Togia'i family acquired title through first occupancy or through adverse possession. That they did acquire title by one or the other of these methods is clear.

That part of the surveyed land on which the two living houses and cookhouse stand and which we now find to be the communal property of the Togia'i title is described as follows: Beginning at the point where the rock wall (the first rock wall west of the main road as shown on the survey) makes the most northerly 90° (approximate) turn to what is substantially north, thence S 8°30' E, 211.5 ft. to the northwest corner of the LDS church; thence by the west wall of such church S 23°30' E, 15 ft.; thence S 66°

8

30′ W, 141 ft.; thence S 88°19′ W 109.35 ft. to said rock wall; thence by said rock wall to the said place of beginning where said rock wall makes said 90° (approximate) turn.

With reference to the third piece of land lying between the two rock walls as shown on the survey, the evidence is overwhelming that all of this third part is the communal property of the Aumua title. And we so hold. Togia'i claimed that he owned a small triangular piece in the southern part of this third section; however, his only vegetation growing on such triangular piece was a very small number of banana trees and two coconut trees growing quite close together. We believe from the evidence that these bananas and the two coconut trees were planted by him with the permission of the Aumua, and that the land occupied by such trees has never been held adversely by the Togia'i so as to enable him to acquire title thereto by adverse possession. The Aumua family has been in possession of and used this third piece of the surveyed tract for many years. Such possession creates a presumption of ownership which was not rebutted.

As heretofore stated the fourth part of the surveyed tract lies west of the more westerly rock wall as shown on the survey. It was admitted by all parties that the Salanoa family owned the kapok tree standing in the most westerly boundary (bearing N 14°40′ E) of the surveyed tract 24 feet from the south end of such boundary as shown on the survey. Togia'i has a cookhouse through which a southern boundary passes, such boundary having a bearing N 58° 28′ W and a length of 165.75 feet as shown on the survey. Most of the cookhouse is on land within the surveyed tract. Togia'i claims that a small triangular tract around the cookhouse is his property. The Salanoa family claims that it owns a five-sided piece on the southern side of this fourth part of the surveyed tract which includes the land

9

claimed therein by Togia'i. It is admitted that the Salanoa family owns a piece of land called LATA lying immediately south of this fourth part of the surveyed tract. We believe that this last-mentioned cookhouse of Togia'i is on Salanoa land through his membership in the Salanoa family.

The dispute between Aumua and the Salanoa family is over the location of the dividing line between the land LATA and the fourth part of the surveyed tract. Despite the conflict in the evidence we are convinced that the weight of the testimony is to the effect that the Salanoa family owns, and has possessed and occupied for many years, certainly more than twenty years, the five-sided piece on the southern part of this fourth parcel, which five-sided piece is described as follows: Beginning at an iron pin at the most westerly corner of the surveyed tract as shown on the survey, thence N 14°40′ E, 24 feet to the kapok tree hereinbefore mentioned; thence S 60°15′ E, 244 feet to the intersection of the more westerly wall with the boundary having a bearing N 88°36′ W as shown on the survey; thence N 88°36′ W, 25.5 feet; thence N 79°32′ W, 61.70 feet; thence N 58°28′ W, 165.75 feet to the aforementioned pin, the point of beginning of this five-sided piece. We find such piece to be the communal land of the Salanoa family.

We are also convinced from the evidence, and in fact it is admitted by all parties, that the Aumua possesses and owns the remainder of this fourth part of the surveyed tract lying north of the above boundary having a bearing of 60°15′ E and a length of 244 feet. Neither the Salanoa nor the Togia'i claims to own any part of such remainder.

Returning now to the part of the surveyed tract lying east of the main road (heretofore designated the first part) as shown on the survey, we find from the evidence that the Aumua dedicated to the Congregation of the LDS Church of Tula for church purposes that part of the sur-

veyed tract lying east of the main road and north of a line the west end of which begins at the mid-point (on the ground) of the west wall of the aforementioned LDS church and extends N 66°30' E a distance of 157 feet to a point in the boundary having a bearing of S 32°48' E, as shown on the survey, such point being 81 feet from the south end of said last-mentioned boundary and 34.35 feet from its north end.

And we further find from the evidence that the Salanoa dedicated to the Congregation of the LDS Church of Tula for church purposes that part of the land included in the survey lying east of the main road and south of the line the east end of which begins in the said boundary (bearing S 30°48' E, as shown on the survey) at a point 81 feet from the south end thereof and which line extends S 66°30' W through the middle of the LDS church lengthwise to the east side of the main road as shown on the survey.

And we further find that the Togia'i dedicated to the Congregation of the LDS Church of Tula for church purposes that part of the land in the survey lying between the main road and the north half of the west wall of the LDS church as shown on the survey.

█ The Congregation of the LDS Church of Tula has the right to use the land lying east of the main road and included in the surveyed tract for church purposes as a result of these dedications. "By analogy, rather than in strict conformity to common-law principles, the theory of dedication has been invoked to uphold gifts for pious and charitable uses, as for churches, schools, and cemeteries, though their benefits are enjoyed by a certain class, and not by the public at large, some of the specific applications of this analogy being found in cases sustaining dedications for the residence of a minister of a particular religious congregation, for a church or for a religious purpose, for a camp ground for holding religious meetings, for a ceme-

11

tery, and for a public school." 16 Am.Jur. 351. Land "may be dedicated for the use of a particular religious sect or denomination, or a particular church society, as a place for worship, as a cemetery, or as a parsonage." IV Tiffany on Real Property (3rd ed.) Sec. 1098. We upheld a dedication of land for purposes of a Mormon parsonage in *Leiato v. Satele & Tapopo*, No. 68-1948 (Am. Samoa). We said in the case of *Gi and Teo v. Taetafea, John Poti and Faalanu*, No. 88-1948 (Am. Samoa) "That land may be dedicated by the owner for church purposes we have no doubt."

■ When the Salanoa, the Aumua, and the Togia'i dedicated parts of their respective lands to the LDS church they gave only an easement in the land, not the fee title. "By a common-law dedication, the fee does not pass. The public acquires only an easement or such interest in the land as is necessary for its enjoyment of the use. The fee ordinarily remains in the proprietor, the public holding the easement in trust." 16 Am.Jur. 402–3. In the Gi case, supra, we said "Of course the church has only an easement in the portion of the land used for church purposes, the fee simple being in the dedicators."

In accordance with the foregoing opinion and findings it is ORDERED, ADJUDGED and DECREED that the land within the surveyed tract described as follows: Beginning at the concrete monument (described as the point of beginning in the survey) thence S 88°19′ W 67 feet; thence N 66°30′ E 298 feet (this boundary line runs lengthwise through the middle of the LDS church aforementioned); thence S 32°48′ E 81 feet; thence S 78°30′ W 254.56 feet to the point of beginning (the concrete monument) is the communal family land of the Salanoa family having four matais, to wit, Salanoa, the senior matai, Iuli, Togia'i and Pua'atu'ua, subject to the right of the Congregation of the LDS Church of Tula to use that part of the quadrangular

piece of land just described lying east of the main road, as shown on the survey, for church purposes, and also subject to the right of the public to use the main road crossing such quadrangular piece for highway purposes.

It is further ORDERED, ADJUDGED and DECREED that the land described as follows: Beginning at the iron pin at the most westerly corner of the surveyed tract as shown on the survey, thence N 14°40′ E 24 feet to a kapok tree; thence S 60°15′ E 244 feet to the intersection of the more westerly rock wall as shown on the survey and the boundary marked on the survey with a bearing of N 88°36′ W 25.5 feet; thence N 79°32′ W 61.70 feet; thence N 58° 28′ W 165.75 feet to the said iron pin (the point of beginning), is the communal family land of the Salanoa family having four matais, to wit, Salanoa, the senior matai, Iuli, Togia'i and Pua'atu'ua, and

It is further ORDERED, ADJUDGED and DECREED that the land described as follows: Beginning at the northwest corner of the LDS church as shown on the survey, thence S 23°30′ E by the west wall of said church 15 feet; thence south 66°30′. W 141 feet; thence S 88°19′ W 109.35 feet to the more easterly rock wall as shown on the survey; thence by said rock wall to a point where said rock wall makes the fourth 90° (approximate) turn as shown on the survey; thence S 82°30′ E 211.5 feet to the northwest corner of said LDS church (which northwest corner was the point of beginning of this tract), is the communal family land of the Togia'i family, subject to the right of the Congregation of the LDS Church of Tula to use for church purposes that part of this tract just described which lies between the east boundary of the main road as shown on the survey and the north half of the west wall of said church, and also subject to the right of the public to use the main road crossing such described tract for highway purposes.

It is further ORDERED, ADJUDGED and DECREED that the remainder of the land as shown in the survey is the communal family land of the Aumua family, (such remainder being all the land in the surveyed tract with the exception of the land herein decreed to be the property of the Salanoa family and of the Togia'i family respectively) subject to the right of the Congregation of the LDS Church of Tula to use for church purposes that part of such remainder which lies east of the main road as shown on the survey; and also subject to the right of the public to use the main road crossing such remainder for highway purposes.

The Registrar of Titles will be advised of this decree.

Aumua bore the expense of making the survey which will inure in part to the benefit of Togia'i and Salanoa. It is equitable under these circumstances that Togia'i and Salanoa should pay the costs.

Accordingly costs in the amount of $25.00 are hereby assessed against Salanoa and a like sum against Togia'i. Costs are to be paid within 30 days.