**FESAGAIGA of Pago Pago, Plaintiff**

**v.**

**SEIGAFO (Family) of Pago Pago, Defendant**

## No. 21-1951

## High Court of American Samoa

### Civil Jurisdiction, Trial Division

[Land: "Tulotu" in Pago Pago]

## December 31, 1951

ARTHUR A. MORROW, *Chief Justice;* LETULIGASE-NOA, *Associate Judge;* and APE, *Associate Judge.*

DECISION

Heard at Fagatogo, December 5, 1951.

Logo for Seigafe; Fesagaiga *pro se.*

MORROW, *Chief Justice.*

On December 29, 1950, Seigafo filed his application with the Registrar of Titles to have the land designated TULOTU in the survey accompanying the application registered as the communal land of the Seigafo Family of Pago Pago. On February 23, 1951 Fesagaiga Saipale of Pago Pago filed his objection to the proposed registration claiming that the land was his individually owned property. Hence this litigation. See Section 905 of the American Samoa Code.

Prior to the hearing the Court viewed the land in the presence of the parties concerned to the end that it might have a better understanding of the evidence when it should be presented at the hearing.

At the outset it should be stated that Seigafo is a title attached to the village of Solosolo on the Island of Upolu in Western Samoa. It is not a Tutuila title attached to Pago Pago. When Seigafo filed his statement with the Court in support of his title to the land he stated that it belonged to him and his wife Sa as their individually owned property. He did not claim it as communal family land as he did when he offered it for registration. Sa, his wife, died many years ago. It is obvious that the land could not be registered in the name of a deceased woman. A dead person is just so much clay and cannot own property. Despite the inconsistency between the character of ownership claimed at the time the land was offered for registration and the claim of Seigafo in his statement, we shall treat the application as an application to register the land as the individually owned property of Seigafo, since there was no claim whatsoever at the hearing that the land was communal family land, and no evidence to support any such claim. On the other hand all the evidence in support of Seigafo's title was to the effect that the land was his individually owned property.

The evidence adduced showed that Seigafo first came to American Samoa from Upolu, Western Samoa, in the year 1926 when he married Sa, a Pago Pago woman who was a member of the Fesagaiga family; that Seigafo and Sa with their two children left American Samoa in 1929 for Upolu and that Sa died shortly thereafter; that Seigafo returned to American Samoa for about three months in 1941 and that he again returned in November 1950 when he had the land TULOTU surveyed; that he left soon thereafter for Upolu where he remained until his return to American Sa-

moa for this hearing. During his three-year stay in American Samoa he claims to have purchased this land from Momo Faga for two hundred dollars.

He had the land surveyed in 1928. However, he did not offer it for registration at that time. He testified he did not do so because he went over to Western Samoa in 1929. He also testified that he had it surveyed with the intention of offering it for registration. Again he testified that he did not offer it for registration because he did not know anything about the law of American Samoa. As a matter of fact, it would not have taken him ten minutes to offer the land for registration in the office of the Registrar of Titles in the Administration Building at Pago Pago. His statement that he did not offer the land surveyed in 1928 for registration because he had to leave for Western Samoa in 1929 does not ring quite true. Also his testimony that he did not offer it for registration because he did not know the law of American Samoa does not ring quite true either because almost in the same breath he testified that he had it surveyed for that very purpose. If he had it surveyed in order to offer it for registration, he must have known that under the law of American Samoa he could so offer it. Otherwise, as a practical matter there would be no point in having the survey made.

The Court observes that the circumstance of not offering the land for registration after he had it surveyed is perfectly consistent with knowledge on Seigafo's part that it was not his land, and that if he had offered it would not have been successful. We do not say, however, that he was aware that he did not own the land, but we do point out that his failure to offer the land for registration is a circumstance consistent with knowledge on his part that he did not own it. When Seigafo testified that he purchased the land TULOTU from Momo Faga, he also testified that he did not know whether Momo Faga had title or not.

Fesagaiga, the objector, testified that the tradition in the Fesagaiga family was to the effect that some years before the Government was established in 1900 the then Asuega and his wife, the blood mother of objector Fesagaiga, found old Chief Mageo lying on this disputed tract in an exhausted condition; that Asuega climbed a coconut tree upon the land and got some coconuts which he gave to his wife who in turn shucked them and gave the exhausted Mageo coconut meat and coconut milk therefrom; that upon his being revived Mageo was so grateful to Asuega and his wife for this kindness in taking care of him that out of the goodness of his heart he gave this disputed tract to the objector's mother as her individually owned property. Anyone who knows Samoans and their way of life knows that this story is not far-fetched at all, although it might sound so to a palagi (white man). The present Mageo testified that the tradition in his family was fully in accord with the testimony of the objector as to how the objector's mother became the owner of the land.

█ It is the practice in this Court to permit the use of family tradition and reputation for the purpose of establishing title to land, despite the fact it is hearsay. *Gauta et al. v. Puailoa,* No. 9-1951 (H.C.Am.S.). "That *title* cannot be so evidenced (in the United States) is generally conceded." V Wigmore (3rd ed.) Sec. 1587. Conditions in American Samoa are entirely different from those in the United States of America. There documents evidencing title to land are recorded, and the title may usually be traced back to the Government without difficulty. In American Samoa there was no government worthy of the name prior to the establishment of a Government here by the U.S. Navy in 1900 and ordinarily there are and were no documents of title to record. It is impossible to secure an abstract of title to most of the land in American Samoa for there are no records from which to make an abstract. Here

the Government did not own the land originally as in many countries. Hence it did not give patents to land to individuals. Samoan families originally acquired ownership of their lands not from the Government but through first occupancy coupled with a claim of ownership. *Maluia et al. v. Isumu*, No. 12-1950 (H.C.Am.S.). On this method of acquisition of title to land, see II Blackstone 8 and Maine's Ancient Law (3rd Am. ed.) 238. Our practice of permitting the use of family tradition and reputation to establish title to land grows out of the necessities of the situation. Furthermore, Section 1 of the American Samoa Code provides that only "so much of the common law of England as is suitable to conditions in American Samoa and not inconsistent" with the constitutional or statutory law in force in American Samoa shall be in effect here. Also we are not unmindful of the fact that the common law was not static. It adjusted itself to new conditions in order that justice might be done. That was one of the prime reasons for its growth.

Objector Fesagaiga's father died in 1916 when Fesagaiga was eight years old. Fesagaiga graduated from the Marist Brothers School in 1923 when he was 15 years of age. He is a man of much more than average ability, a member of the Fono and has held an important and responsible position in the office of the Attorney General for years. He seems to have been a favorite son of his mother. When he was only fifteen it appears that she began to entrust him with handling some of her affairs. If he is a man of ability, he was also a boy of ability. For a fond and widowed mother to begin to trust an able and favorite son with the handling of important affairs for her when he was only 15 years old is not to be unexpected in Samoa particularly when he had much more education that [sic] she did.

Evidence in support of the objector's claim is to the effect that the disputed land was occupied by Tiute, a

blood sister of the objector, and her husband Simi from 1923 to 1929; that Tiute and Simi were authorized to occupy it by Tiute's and the objector's blood mother. From 1929 to 1935 no one lived on the land, but the objector's brothers and sisters and their families had plantations on it and used the crops therefrom under the authority of the mother given through the objector. From 1935 to 1942 Suanoa, a blood brother of the objector, occupied the land upon the objector's authorization. From 1942 to 1946, Sie, the objector's adopted son, and his wife, Ario, occupied it, also upon the objector's authorization. After they moved off in 1946 no one again lived on it until 1948 but it was looked after by the objector who had plantations on it for the use of his own family and the families of his blood brothers and sisters. In 1948, Alualu, a niece of the objector, and her husband Lokeni, built a Samoan fale on it and lived in it under the authority of the objector until June 1950 when the objector himself moved his family to the land and erected a palagi house upon it, which house the objector and his immediate family have occupied ever since it was built. The objector has many plantations on the land which he uses for the support of his immediate family.

Seigafo explains the use and occupancy of the land by Tiute and Simi, Suanoa, Sio and Ario, Alualu and Lokeni, and finally Fesagaiga himself by saying that when he (Seigafo) and his wife Sa went to Upolu in 1929 they left the land in charge of Sa's family; that since Sa was a Fesagaiga woman it was in accordance with Samoan customs that only Fesagaiga people should occupy or use the land. Of course it is true that if they did turn the land over to the Fesagaiga family to control, it would follow under Samoan customs that only Fesagaiga people would occupy and use it; and it is also true that all the people who have occupied it and used it, including the objector himself, have

been members of the Fesagaiga family. But the only Fesagaiga people who occupied the land after Seigafo went to Upolu in 1929 were the blood brothers, sisters and niece of the objector, his adopted son and himself. There are many people in the Fesagaiga family (clan) who are not brothers and sisters of the objector, and not his niece, and not his adopted son and not closely related to him. In the ordinary course of events it would be expected that at least some such members of the Fesagaiga not closely related to the objector by blood or adoption would have occupied the land for at least part of the time. Admittedly such did not occur. We are convinced from the evidence that the occupancy from 1923 to 1935 was under the authority of the objector's mother and thereafter under the authority of the objector himself as he testified.

Fesagaiga's mother died in 1938. The testimony of the objector was that she gave him this land since he was her favorite son and she wanted him to have a place for himself and his family, a place which he could own as an individual. The circumstances indicate that she made the gift about 1935. The weight of the evidence is to the effect that ever since 1935 all the occupants of the land have occupied it upon the authority of the objector himself.

█ It is our opinion if there was any defect in the mother's title that the objector acquired a valid title through the operation of the doctrine of adverse possession. We think in view of the gift of the land by the objector's mother to him that there was the necessary privity between the objector and his mother so as to enable him to tack his possession to hers so as to make up the 20 years. "The relationship of a donor of land to his donee will supply the necessary privity to permit the tacking of the adverse possession of the former to that of the latter." 2 C.J.S. 689. From 1923, when the mother authorized the objector's blood sister and her husband Simi to occupy the

land, to December 29, 1950, when Siegafo offered the land for registration as the communal family land of the Seigafo family of Pago Pago, is much more than 20 years.

It is clear to us from the evidence that from 1923 to June 1950, when the objector himself moved his family on to the land, that it was in the actual, open, notorious, continuous, exclusive, peaceable and hostile possession of the persons who used it first under the authority of the objector's mother and later under the authority of the objector himself. Such possession was available first for the mother's adverse possession and later for the objector's adverse possession if it was not already the mother's land.

■ "It is not necessary that the person claiming title by adverse possession should have been in personal occupation of the land. Possession by an agent or by a tenant under him inures to his benefit and satisfies the requirements of the statute of limitations. What a man may do himself, in the matter of taking and holding possession of real estate, he may do by another. It is immaterial whether the lessees held under a written or verbal lease to make their holding available for the lessor's adverse possession." 2 Corpus Juris 73.

It appears that Sieni, a daughter of Siegafo, made some loose verbal claims to the objector to the effect that the land belonged to Siegafo, when the objector started to build his house on the land in June 1950. Even if the statute of limitations had not already run at that time such loose verbal claims made by the daughter in behalf of Siegafo would not interrupt it.

■ "The mere denial by the owner of the right of the adverse occupant or loose verbal claims of title in himself, or ineffectual protests short of a disturbance of the rights of the adverse claimant in a legal sense, and short of the assertion of a right in himself, will not interrupt the run-

ning of the statute or prevent its becoming a bar." 2 Corpus Juris 94.

If it be conceded that Seigafo did purchase the disputed tract from Momo Faga, and if it be further conceded that Momo Faga had title to the land when he sold it to Seigafo, nevertheless, under the doctrine of acquisition of title by adverse possession, the title became vested in the objector at the end of 20 years of such possession. *Maxwell Land Grant Co. v. Dawson*, 151 U.S. 586, 607; *Perry v. Clissold*, (1907) App. Cases, 72; *Puailoa v. Leapaga*, No. 64-1948 (H.C.Am.S.); *Vaimaona v. Mulitauaopele S.*, No. 57-1948 (H.C.Am.S.). "The possession of real property during a prolonged period affords ground for a presumption that the possessor has held under a grant. . . . Accordingly where it is shown that there has been adverse possession of land during twenty years or the period fixed by the statute of limitation, a presumption will be indulged that the possessor or some grantor had a deed and that all acts necessary to give it effect had been performed." 1 Jones on Evidence in Civil Cases (4th ed.) Sec. 76. Sec. 907 of the American Samoan Code fixes the period governing the acquisition of title to land by adverse possession at 20 years.

In accordance with the foregoing opinion, it is ORDERED, ADJUDGED and DECREED that the land TULOTU in the village of Pago Pago, as shown on the survey accompanying the application to register it, is the individually owned land of Fesagaiga Saipale and the Registrar of Titles will so register it.

Inasmuch as the benefit of the above survey paid for by Seigafo will inure to the benefit of Fesagaiga Saipale it is considered equitable and just that he should pay the costs of this case rather than Seigafo. Accordingly costs in the sum of $25.00 are hereby assessed against Fesagaiga Saipele, the same to be paid within thirty days.