**GI of Pago Pago and MAGEO of Pago Pago, Appellants**

**v.**

**TE'O, ASUEGA S. & LEALAIFUANEVA, S. P. MAUGA, FUGA SELEGA, and LEOTA, Appellees**

No. 35-1961

High Court of American Samoa

Civil Jurisdiction, Appellate Division

July 28, 1961

---

OPINION AND ORDER OF AFFIRMANCE

Heard before MORROW, *Chief Justice, Associate Judge* MALEPEAI, and *Temporary Associate Judge* MALA-UULU on July 3, 1961.

Ben Schirmer, counsel for Gi.

Anavataua, counsel for Te'o.

A. P. Lauvao, counsel for S. P. Mauga.

Mageo, *pro se.*

Fuga Selega, *pro se.*

Aumoeualogo, counsel for Leota.

MORROW, *Chief Justice*

We have before us two appeals in the case of *Te'o, Tavai Esela, Asuega S. & Lealaifuaneva, S. P. Mauga, Mageo Maaele & Felise, Fuga Selega, Leota, all of Pago Pago, Alo Simanu of Fagasa, Savea of Faganeanea, and Folau I. Teofilo of Fatumafuti v. Gi of Pago Pago,* No. 45A-1960, in which the Trial Division decreed that the litigants, viz. Gi, Te'o, Asuega and Lealaifuaneva (as one), Mauga, Mageo, Fuga and Leota should each have a certain portion of 6.74 ± A. of land, known as the Water Catchment Basin and also as Utumoa, in the Pago Pago area registered as the communal family land of his title. The Water Catchment Basin contains 6.74 ± acres of land. The seven parts to be registered totaled 6.74 ± A., i.e., the entire Water Catchment Basin. The trial court ordered 0.30 ± A. to be registered as the communal family land of the Gi title of Pago Pago and 2.04 ± A. to be registered as communal family land of the Mageo title of Pago Pago.

Mageo appealed claiming that the entire 6.74 ± A. in the Water Catchment Basin was Mageo land and that the trial court erred in decreeing the registration of any part of it in the names of any of the six other litigants.

Gi also appealed claiming that the methods pursued by the trial court in determining the amount of land in the 6.74 ± A. which each of the claimants owned were not correct. We assume that Gi meant to claim on appeal that the trial court should have decreed that the Gi title should have had more than 0.30 ± acres registered in its name, although, as a matter of fact, Gi's notice of appeal contains no claim to the effect that the trial court should have found that the Gi title was the owner of more than 0.30 ± A. and

571

should have decreed that more than 0.30 ± A. in the 6.74 ± A. should be registered as Gi land. However, counsel for Gi claimed in his argument that all the 6.74 ± A. was Gi property.

There were 10 different claimants before the trial court, each of whom claimed to own the entire 6.74 ± A. Originally there were 11, but Chief Tavai withdrew his claim in favor of Mauga when the trial began.

If the Appellate Division should modify the trial court's decree so as to order more than 2.04 ± A. to be registered in the name of the Mageo title, it would follow that any increase in the 2.04 ± A. decreed to be so registered would result in a corresponding decrease in the amount to be registered in the names of the other six litigants, since there are only 6.74 ± A. in the entire Water Catchment Basin, all of which was decreed to be registered among Mageo and the other six. In other words, should the Appellate Division modify the trial court's decree so as to order 3.04 ± A. instead of 2.04 ± A. to be registered as Mageo communal land, the Court would necessarily have to order only 3.70 ± A. to be registered as the property of the other six instead of 4.70 ± A. And, likewise, if the Appellate Division should modify the trial court's decree so as to order more than 0.30 ± A. to be registered as Gi communal property, it would necessarily have to order less than 6.44 ± A. (6.74 ± A. less 0.30 ± A.) to be registered as the property of the other six litigants. Because any modification of the trial court's decree in favor of Mageo and/or Gi would adversely affect either Mageo or Gi or one or more of the other five litigants, the Court has considered the other five, viz. Te'o, Mauga, Asuega S. and Lealaifuaneva (as one), Fuga, and Leota, as appellees.

Alo Simanu, a party in the case before the trial court, asked leave to appeal after the statutory time of seven days within which notice of appeal must be filed with the Clerk

had elapsed. As a preliminary matter before the Appellate Division, Alo was permitted to make an argument as to why the Court should grant him leave to appeal. There were opposing arguments in behalf of a number of the appellees. In his argument Alo claimed that the trial court ". . . failed to consider the fact that the water floating to the land now in dispute comes from Alo lands." It is sufficient to say that whether it comes from Alo lands or not, the trial court was not determining the ownership of the "water floating to the land now in dispute." It was determining the ownership of the land comprising the Water Catchment Basin with a view to ordering its registration.

Alo also claimed in his argument that ". . . my family as well as the people of my village first cut the bush which was in the land now in dispute. All those things are not considered in the decision of the trial court." It is sufficient to say that Talking Chief Atuatasi, the member of the Alo Family who represented it at the trial, was asked this question when he was on the witness stand:

"Q Did you yourself or Alo or any members of your family cut a single bush, virgin bush, or cleared within the surveyed tract or just surrounding the surveyed tract?"

to which question he answered, "No."

While on the stand Atuatasi was also asked this question:

"Q Then you are telling us that the Alo people have never had any plantations inside the surveyed tract?"

Atuatasi answered "Yes" to this question. Alo Foa (he holds the Alo title jointly with Pepe and Simanu) told the judges, when they viewed the land in dispute in the presence of the parties before the hearing, that the Alo Family had no land inside the surveyed tract. We think the trial court considered the foregoing evidence when it determined that the Alo title was not the owner of any land within the surveyed area.

Alo also stated that, "The chiefs of Pago Pago Village now occupying the land in dispute have certain connections to this family. Isn't that the reason why they occupy the land now in dispute?" Conceding that the chiefs of Pago Pago do have "certain connections to this (the Alo) Family," it does not follow that land in the Water Catchment Basin is the property of Alo and not the property of Pago Pago chiefs who cleared it and occupied it, claiming it as the communal land of their families.

The Court denied leave to Alo to appeal upon the ground that he had not given notice of appeal within the seven days allowed by law for filing notice of appeal with the Clerk. The ruling of the Court was obviously correct.

Gi claims that the trial court committed error when it did not specify in its decree the bearing and distance of each boundary of each of the pieces of land decreed to be registered as the property of seven of the various claimants. The area of each piece, as it will later appear, could easily be determined without giving the description of each piece by metes and bounds, i.e., by giving the terminal points and angle of each boundary. Suffice it to say that such a procedure was not necessary.

Gi filed his application to register the entire Water Catchment Basin as the communal property of his title. With it he filed a survey of the tract, which survey showed that the Basin contained $6.90 \pm$ A. Ten different chiefs filed objections to the proposed registration by Gi, each of them claiming as did Gi that the entire Water Catchment Basin was the communal property of his title. It was found after the case was submitted that the original survey was slightly erroneous. The Court procured a new survey to be made by the Government surveyor using the triangulation method, a more accurate method in a mountainous area than measuring with a tape on the ground and measuring the angle for each separate boundary as was done in

making the first survey. The new survey made by the Government surveyor showed that the area of the tract was 6.74 ± A. instead of 6.90 ± A. as indicated by the first survey.

Prior to making the new survey, notice was given to the various claimants and they had an opportunity to attend the survey, and many, if not all of them, did. Also public oral notice of the intended survey was given by the pulenu'u of Pago Pago at a meeting of the chiefs of the village.

Prior to the hearing the trial court viewed the land in the presence of the claimants. It questioned them on the land itself in regard to what each claimed, where each had or had had plantations, who cleared the various parts of the land from the bush, and other evidentiary matters bearing on ownership. The Court heard testimony for five days and it also listened to arguments of counsel. There was much conflict in the evidence. The witnesses for claimant A usually told a different story from the witnesses for claimant B. The Court weighed the testimony. It had each claimant mark on the survey the land on which he claimed to have or have had plantations.

After considering all of the evidence, the Court itself marked on the old survey the boundaries of that part of the surveyed tract which it considered that the preponderance of evidence showed each of the seven claimants (Gi, Te'o, Mauga, Mageo, Asuega and Lealaifuaneva (as one), Fuga, and Leota) to own, it first having concluded from the evidence that claimants Savea, Alo, and Folau owned no land inside the surveyed tract. The Court then procured the Government surveyor to determine how much land each of the seven claimants had in the part or parts of the surveyed tract marked off as his property by the Court. Instead of calculating the bearing of each boundary and its length and then determining the area by the latitude and

departure method, the Government surveyor used a planimeter, an instrument used by surveyors for computing areas. The planimeter itself makes the mathematical calculation mechanically just as an adding machine makes a mathematical calculation mechanically when it adds up a bunch of figures upon the totalling key being pressed. It was discovered that the total area of the parts of the surveyed tract was less than the 6.90 ± A. shown on the survey. The Court then knew that there was an error in the survey and procured a new one to be made.

The Government surveyor stated on the new survey furnished to the Court that, "Iron pins at all angle points are the originals set during the survey of January 2, 1957. Positions of monuments were redetermined and courses and distances recomputed. This survey supersedes the survey of 1957." Thus the new survey covered the identical land covered by the old survey of January 2, 1957 which Gi filed with his application to register. However, the computed areas in the two surveys differ by 0.16 ± A. And this difference was obviously the result of the Government surveyor's using the triangulation method of surveying in a very steep and rough area instead of measuring distances on the ground with a tape and getting the bearing of each boundary by measurement instead of mathematical computation.

After the second survey was made and the area of the entire tract calculated mathematically, the Court had the boundaries which it itself had previously marked on the old survey transferred to the new survey, under the direction of the Government surveyor. The Government surveyor then calculated for the Court the area of the part of the surveyed tract determined by the Court to be the property of each one of the seven claimants which the Court found to have land in the surveyed tract. In making the calculation for the Court, the Government surveyor

again used a planimeter, the small computer used by surveyors for computing areas. The total of the areas of the various parts aggregated 6.74 ± A. which accorded with the new survey to the nearest hundredth of an acre, and which constituted a check to show that the computations of the various areas by the use of the planimeter were correct. It was the planimeter in the first place which demonstrated that there was an error of 0.16 ± A. in the area of the Water Catchment Basin as shown on the first survey of January 2, 1957. There is no merit in Gi's claim on appeal that the Court did not use a proper method to determine the areas of those parts of the surveyed tract which it determined to be the property of each of the seven respective claimants.

It is claimed by counsel for Gi that the "Tense of language of Court had misled the appellant causing his failure to mark on the map all of area cleared." In his argument counsel states that "When appellant Gi was called upon by the Court to mark on the original survey map (the one he filed for registration), the tense used was referred to existing plants and crops. There was no mentioned [sic] of areas cleared and planted before or area where plantations used to be but are not in existence now." It must be borne in mind that the areas marked on the original survey by the various claimants to indicate to the Court the areas claimed by them respectively and where they had plantations were only one item of the evidence before the Court.

We believe that counsel Seugogo is in error when he claims on appeal that when the Court called on Gi to mark on the survey where the Gi people had plantations the Court used only the present tense so that Gi would mark only the area where he presently had plantations. The transcript of the testimony shows the following:

"CJ: Now we would like to have each party come up who claims to have plantations on this land and mark on the maps—we got three of them here—where his plantations were.

(Whereupon Gi marked on the map)

"CJ: Now, Gi, do you solemnly swear that the place that you have marked on the map is the place inside the six and nine-tenths acres where you had your plantations? Now just yes or no?

"GI: Yes.

"CJ: All right. Is this the only plantation you ever had on the land, which you have marked, on this six and nine-tenths acres?

"GI: That is all.

"CJ: Did you have any other plantations inside the six point nine-tenths acres?

"GI: No."

The fact is that Mageo, when he marked on the survey the areas on which he claimed the Mageo people had plantations, included in his marking the very same land marked by Gi. Fuga also claimed by his marking on the survey that he had plantations on a large part of the land marked by Gi. Gi claimed that he had plantations on each side of the stream north of the filter shed, the area being cut by the stream into two parts. Witness Leota, who had plantations on the right-hand side, was asked "Now did you ever see any Gi people working there on the left-hand side?" to which he replied "No." We think that Onosai (Gi's young man's name) as Onosai may have had some plantations on part of the land claimed by Mageo since the evidence showed that Gi Onosai is a member of the Mageo Family. The transcript shows that Judge Ape asked Mageo: "We have seen the plantations of the Gi people. Why did you not object to those plantations?" to which query witness Mageo replied: "Because Gi Onosai is a member of the Mageo Family. I let him do that because he knows I am the boss." Mageo claimed that the Gi Family had no land inside the surveyed tract. Most of the testimony for Gi was based on hearsay since Seugogo, his

witness, did not become a member of the Gi Family until he married Gi's daughter in 1945. He relied to a great extent on family tradition told to him after 1945.

Despite the great conflict in the testimony with respect to Gi's ownership of a part of the land (he claims all of it and Mageo claims all of it, too), we are satisfied from the evidence that Gi is the owner of 0.30 ± A. in the 6.74 ± A. as found by the trial court. In order to reverse the trial court's decision and grant a new trial, the Appellate Division must find that the finding that Gi was the owner of only 0.30 ± A. was clearly erroneous. Section 213, Chapter 5 (Judiciary and Judicial Procedure) of Section 10 of Amendments, Nos. 11–59, 1952, provides that "The finding of fact of the Trial and Probate Divisions of the High Court in cases tried by them shall not be set aside by the Appellate Division of that Court unless *clearly erroneous* (emphasis added)." We think the evidence before the trial court, despite the great conflict in the testimony, reasonably supported the conclusion that Gi had 0.30 ± A. in the surveyed tract but since one witness told one story to the Court, another witness another story, and sometimes a third witness still another story, we cannot say that the finding that Gi owned only 0.30 ± A. of the land in dispute and no more was clearly erroneous.

We are satisfied from the evidence that the Mageo title does not own all of the 6.74 ± A. Samoans acquired title to their lands through first occupancy accompanied by a claim of ownership. This was the principle laid down by the High Court in the cases of *Soliai v. Lagafua,* No. 5-1949 (H.C. of Am. S.) and *Faataliga v. Fano,* No. 80-1948 (H.C. of Am. S.), and it has been followed by the Court in a number of other cases. The usual way by which a Samoan family acquired title to land was to clear it from the virgin bush, put in plantations on the cleared land, occupy it and claim it as their own communal property.

Mageo's testimony at the trial indicated that while he claimed all of the land on both sides of the stream, nevertheless the Mageo people had plantations only on the left-hand side. However, there was much testimony indicating that Mageo people had or had had plantations not on all of the left-hand side but only on a part of it. Unquestionably, the Leota people, the Gi people, the Te'o people and the Mauga People have land inside the surveyed tract on the right-hand side of the stream.

The testimony of Mageo bearing on his claim to the right-hand side of the surveyed tract was as follows:

Q I see. Well, then, the Mageo people didn't clear any on the right-hand side?

"A No.

"Q Well, now, did you tell us a minute ago that you claimed to own the land on the right-hand side, too?

"A Yes, I did, Judge.

"Q Well, now, how did you get title to that side; how did you become the owner? You can just give us a summary of what facts made you the owner of the right-hand side. Now what did you do or what did the former Mageo do to become the owner of the right-hand side?

"A We got it from a fight against the Mageo—against Maneafaiga.

"Q You mean two Mageos were fighting?

"A Two different persons. Maneafaiga is different from Mageo, but our family originated from Tatafafieloa and Maneafaiga.

"Q When did this fight occur?

"A I cannot tell; a long time ago.

"Q Then it's tradition?

"A It is, Judge.

"Q Well, now, how did the fellow that lost the fight, how did he get ownership of that land when it was virgin bush? What did he do to become owner?

"A Maneafaiga was the only warrior of Tutuila at that time and Malietoafaiga in Upolu."

It is clear from Mageo's own testimony that, despite his claim, the Mageo people never cleared any of the land on

the right-hand side; also that his claim to that side is based on a hearsay story handed down from a long time ago, so far back that Mageo did not know when the story originated. Such stories handed down by word of mouth from person to person from a long time ago are notoriously inaccurate. There are many stories handed down by word of mouth from long ago in Samoa. If A tells B a story today and B repeats it to C 25 years from now and C to D 25 years later and D to E 25 years later and E to F 25 years later and F to G after another 25 years and G to H after another 25 years and A could be brought back to life and H repeat the story back to him after 150 years, A in all probability would not recognize it as the same story he told B 150 years before. Stories handed down like that are just hearsay piled on hearsay. In the course of time they frequently develop into the category of fairy tales.

And if the story about Maneafaiga having a fight with Malietoafaiga be true with the result that Maneafaiga did claim to own the right-hand side, any claim he might have had to it has long since been wiped out by the fact that that side, according to the evidence, has been in the possession of other claimants for more than 20 years under circumstances making their possession adverse to any claim or title of the Mageo. Adverse possession for the statutory period operates to divest the true owner of his title and to vest it in the adverse possessor. The Supreme Court of the United States announced this rule in the case of *Maxwell Land Grant Co. v. Dawson*, 151 U.S. 586, 607. Section 907(2) of the American Samoa Code provides that the "statutory period governing acquisition of title by adverse possession" shall be 20 years. This Court ruled that adverse possession for 20 years divests the owner of his title and vests it in the adverse possessor in the case of *High Chief Fuimaono v. Moananu and Felila*, No. 12-1955

(H.C. of Am. S.). The editors of Corpus Juris Secundum state the same rule in 2 Corpus Juris Secundum at p. 803.

As in the case of Gi, there were many different stories told by the witnesses in regard to Mageo people and their possible connection with the land. There was much conflict in the testimony bearing upon what land in the surveyed tract is Mageo property. The trial court weighed the testimony and it concluded that the weight of evidence was to the effect that the Mageo people had 2.04 ± A. on the left-hand side of the stream and that the Asuega and Lealaifuaneva (as one), Te'o, and Fuga also had land inside the surveyed tract on that side of the stream. It must be admitted that the different witnesses did not all tell the same story to the Court and that there was a conflict, a very serious conflict, in the testimony. We cannot say upon reviewing the evidence before the trial court that the finding that the Mageo had only 2.04 ± A. inside the surveyed tract was clearly erroneous. We think it was not.

It is our conclusion that the decree of the trial court in the case of *Te'o of Pago Pago and others v. Gi of Pago Pago*, No. 45A-1960 should be affirmed.

### ORDER OF AFFIRMANCE

Accordingly, it is ORDERED that the decree of the trial court in the case of *Te'o, Tavai Esela, Asuega S. & Lealaifuaneva, S. P. Mauga, Alo Simanu, Mageo Maaele & Felise, Fuga Selega, Leota, Savea, and Folau I. Teofilo v. Gi*, No. 45A-1960 be and the same is hereby affirmed.

Costs in the sum of $16.50 are hereby assessed against Mageo and Gi, each to pay $8.25 within 30 days. However, since the land within the surveyed tract is being taken by the Government of American Samoa for public purposes, the above court costs will be paid by the Director of Budget and Finance pursuant to the directive of the Governor of American Samoa (reference GAS/1A over Serial 755)

dated December 17, 1957 to the Director of Budget and Finance.